IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
July 16, 2013 Session

## GEORGE R. VRANEY, M.D. v. MEDICAL SPECIALTY CLINIC, P.C.

**Direct Appeal from the Chancery Court for Madison County**
**No. 65204      Tony A. Childress, Chancellor by Interchange**

_____

**No. W2012-02144-COA-R3-CV - Filed September 9, 2013**

_____

This is a breach of contract case. Appellant, a medical doctor, was hired by Appellee Clinic under terms outlined in an employment agreement. After four years employment, the relationship between the parties reached an impasse and Appellant made plans to leave the Clinic to open his own practice. When the parties could not agree concerning payments due under the contract, the instant lawsuit was filed by Appellant, claiming that the Appellee had breached the contract. Appellee counter-sued for breach of contract, breach of duty of loyalty, and conversion, claiming that the Appellee had retained certain of his accounts receivable and had limited his work schedule in contravention of the contract. The trial court granted summary judgment in favor of the Appellee on the breach of contract and duty of loyalty claims, and set damages pursuant to the report of the Special Master. Appellant appeals. We conclude that remaining questions of law and fact preclude the grant of summary judgment, but that the trial court properly denied Appellant's claim for unpaid vacation time and properly referred the issue of damages to the Special Master. Reversed in part, affirmed in part, and remanded.

**Tenn. R. App. P. 3. Appeal as of Right; Judgment of the Chancery Court Reversed in Part; Affirmed in Part; and Remanded**

J. STEVEN STAFFORD, J., delivered the opinion of the Court, in which ALAN E. HIGHERS, P.J.,W.S., and HOLLY M. KIRBY, J., joined.

Tim Edwards and Whitney Boshers, Memphis, Tennessee, for the appellant, George R. Vraney, M.D.

Todd P. Photopulos and Elizabeth E. Chance, Memphis, Tennessee, for the appellee, Medical Specialty Clinic, P.C.

**OPINION**

# I. FACTUAL HISTORY

## A. Employment Agreement

George R. Vraney, M.D. ("Dr. Vraney," "Appellant," or "Plaintiff") began his employment with Medical Specialty Clinic, P.C. (the "Clinic," "Appellee," or "Defendant") in January of 2003. At all relevant times, and pursuant to the employment agreement (*infra*), Dr. Vraney was a Clinic employee, but was not a partner in the practice. While the last written agreement between the parties is dated 2005 and expired (by its own terms on December 31, 2006), it is undisputed that the terms of that agreement governed the relationship between the parties until Dr. Vraney's employment was terminated in 2007. The pertinent provisions of the employment agreement are set out in full context below, however, it is undisputed that the original agreement provides, in relevant part, that: (1) either party could terminate the agreement "on sixty days' notice to the other [party];" (2) "[Dr. Vraney's] salary will continue as [he] work[s] those sixty days, or until [he] obtain[s] other employment or otherwise commences practice;" (3) [Dr.Vraney] will be "involved full-time in our practice of medicine, practicing the specialty of pulmonology and [] will not take any outside employment during any term of this agreement without [the Clinic's] written approval;" (4) Dr. Vraney will be paid a base salary of $12,500 per month as well as bonuses based on "net receipts" (as that term is defined in the contract); (5) unused vacation time will not carry over to following years and the Clinic will not pay for unused time; (6) Dr. Vraney will not have any ownership interest in the Clinic and will not be entitled to his accounts receivable; and (7) during the pendency of the contract, and for two years thereafter, Dr. Vraney will not "induce or attempt to influence any hospital or any other healthcare facility or any physician or any other professional with a referring relationship with the practice to terminate that relationship."

During negotiations for a new contract in the early part of 2007, Dr. Vraney requested that he be given the right to his accounts receivable. The Clinic would not agree to this arrangement based upon the fact that Dr. Vraney did not wish to make a financial contribution to become a shareholder in the Clinic. As noted in his letter of March 13, 2007, which was sent to Dr. Robert Hollis, a partner in the Clinic, *see infra*, Dr. Vraney was of the opinion that he had already made a financial contribution to the Clinic sufficient to constitute a "purchase" of his accounts receivable.

In addition to the accounts receivable issue, evidence in the record suggests that Dr. Vraney also felt overworked by the schedule he was keeping at the Clinic and did not see the possibility of any reduction in his hours or any additional employees being hired to palliate the work load.

## B. March 2007

At some point in March 2007, Dr. Vraney and Dr. Hollis had a private meeting, or meetings, concerning accounts receivable and possible payment for unused vacation time. At one of these meetings, Dr. Hollis allegedly offered Dr. Vraney $25,000 for unused vacation time (we will discuss this offer further *infra*). However, these discussions did not result in complete resolution of all issues concerning Dr. Vraney's compensation and the parties' relationship deteriorated further.

With negotiations at an impasse, Dr. Vraney made plans to leave the practice. On March 13, 2007, Dr. Vraney sent a letter to Dr. Hollis in which he reiterated his contention that he had made sufficient financial contribution to the Clinic to result in an accounts receivable "purchase":

> When I started here in April of 2003 I was promised a base salary. At the end of that first year my productivity had produced a negative "bonus" of $101,491. My accounts receivable at that time less current month's charges was $35,828.
> Had I required the clinic to stick to the income guarantee the net negative $101,491 would have been zeroed out. I did not [consider it zeroed out]. Over the next two years, I paid back that $101,491 and would not receive my first bonus money until that was repaid. Certainly the accounts receivable were "purchased" at that time.
>
> *                    *                    *
>
> While the clinic could opt to make good on the original contract and reimburse me the $101,491 plus interest I think that unlikely. Short of that option if, after reconsideration, the partners decide they are entitled to any part of my earnings beyond the generous contribution I make monthly to the general overhead I will plan to begin a long deferred extended vacation beginning the 1st of April.

On March 29, 2007, Dr. Vraney incorporated his own medical practice. Also in March 2007, Dr. Vraney hired Advanced Medical Billing and Consultants, L.L.C. ("Advanced Medical") to assist him in credentialing his new practice with various insurance

providers, and to ultimately do all the billing and collection work for his new practice.

Sometime in early March 2007, Dr. Vraney sent an undated note to the Clinic's scheduling staff. The note indicated that Dr. Vraney should only be scheduled to see office patients on a limited basis, beginning in May 2007; specifically, he instructed the staff that his in-office availability would be limited to the dates of May 1, 3, 10, 15, 17, 22, and 24, 2007. According to Dr. Vraney's deposition testimony, he did not speak directly to the partners before giving the staff the order to reduce his office hours during the month of May. Dr. Vraney stated that he did not communicate the fact that he was reducing his office hours to the other doctors because his usual practice was to set his own hours. At any rate, there is some dispute in the record as to whether, or to what extent, Dr. Vraney's colleagues were aware of his desire for an abridged May schedule before he notified them, by letter dated March 30, 2007, that he would be leaving the Clinic:

> As I complete four years with the clinic and see no possibility of help in the foreseeable future I am forced to face the simple reality that I can not continue with the current and seemingly ever increasing demands of both the inpatient and outpatient practices. Therefore, effective July 1[st] I will complete my employment by the clinic and close my outpatient practice of Pulmonary Medicine.
>
> \*                              \*                              \*
>
> It will be my objective over the next few months to make this transition as smooth as possible. I would hope that we could get notification out to patients in the very near future so that I can address their immediate needs and help them plan for future care.
>
> I will continue to work in the hospital as a Pulmonary/Critical Care consultant and look forward to continuing our professional relationship with those of you who will need consultation . . . .

### C. May 2007

Dr. Vraney testified that after sending the March 30, 2007 letter, he continued with the Clinic under the assumption that June 30, 2007 would be his last day of work. There is no indication that he limited his office hours until the beginning of May 2007, when he began to work the truncated schedule he had set out in his note to the staff, *supra*.

We infer from the record and the course of events that the Clinic partners did not became aware of Dr. Vraney's limited office schedule until that schedule began at the beginning of May 2007. The Clinic partners were of the opinion that Dr. Vraney's limited schedule was a breach of the contractual requirement that he be a "full-time" employee, as they defined that term. As Dr. W. Patrick Teer testified: "[T]he fact that [Dr. Vraney] was indicating to the scheduling staff that he was curtailing how many patients he was seeing to me would indicate that he is no longer working full-time." Despite this statement, Dr. Teer admitted that the Clinic did not define the doctors' hours; rather he stated that "the individual physician" sets his or her hours. Dr. Teer opined, however, that in order to be considered "full-time," he would expect that Dr. Vraney would need to work a schedule consistent with that he had worked during his four-year tenure with the Clinic; Dr. Teer could not answer the question of how many hours Dr. Vraney had usually worked prior to giving his notice that he was leaving the practice. As set out in his amended complaint, Dr. Vraney felt that his:

> workload continued to increase throughout his employment with [the Clinic], and in 2007 had become such that [Dr. Vraney] could no longer handle the patient load which he had developed. [The Clinic] failed or refused to provide [Dr. Vraney] with support needed to care for, without working excessive hours, the number of patients which [Dr. Vraney] then had.

Allegedly due to Dr. Vraney's reduced office schedule, on May 7, 2007, the Clinic terminated the employment of Carol Emison. As stated by Dr. Vraney's attorney at the May 14, 2010 hearing on summary judgment, discussed *infra*, Ms. Emison's employment "was devoted full-time to assist Dr. Vraney." When asked the reason for terminating Ms. Emison's employment, Dr. Teer testified, in his June 9, 2009 deposition, that Ms. Emison's employment was terminated for "financial reasons," and to "decrease the overhead that was attributed to Dr. Vraney." Dr. Vraney argues that the Clinic's action in terminating Ms. Emison's employment severely limited his ability to see or bill office patients and was, ostensibly, a constructive termination of his employment. Dr. Teer concedes that Ms. Emison was Dr. Vraney's "primary assistant."

Following Ms. Emison's departure from the Clinic, on May 9, 2007, Dr. Vraney's then-attorney sent a letter to Dr. Hollis. The letter refers to the termination of Ms. Emison as an "unfortunate event [that] was of no benefit to either Dr. Vraney, his patients or [the Clinic]." The letter alleges that the Clinic's actions "have seriously impaired Dr. Vraney's ability to provide patient care at the clinic and have needlessly created an overtly hostile work environment." In addition, and as discussed in further detail *infra*, the letter states that Dr. Vraney had authorized his attorney "to propose a buyout of his vacation time by Medical Specialty Clinic in the amount of $50,000.00."

On or about May 10, 2007, the Clinic sent a letter to its patients, indicating that Dr. Vraney would be leaving the Clinic. The letter stated that the Clinic did not know the location of Dr. Vraney's new practice. Dr. Vraney contends that the Clinic's statement that the location of Dr. Vraney's new practice was unknown was not accurate. Rather, he asserts that the Clinic was aware, from the content of his March 30th letter, that his new practice would be located at the hospital; therefore, he avers that the Clinic's letter contained misinformation meant to hinder Dr. Vraney's ability to draw patients and referring doctors to his new practice.

Dr. Vraney's March 30, 2007 notice of intent to terminate his employment, *supra*, notwithstanding, by letter of May 22, 2007, which letter Dr. Vraney states was "handed to him" on May 22, the Clinic notified Dr. Vraney:

> This is to serve as notice that your employment with Medical Specialty Clinic will end as of May 30, 2007. While we had initially agreed with your request for a longer period of time than the sixty (60) day termination period outlined in your Employment Agreement, that agreement was predicated upon your continued, full time service to the Clinic. Your proposed substantially reduced schedule does not constitute continued, full time service, and is not acceptable. You will be paid your salary through the end of May, and your quarterly bonus shortly after the end of the second quarter consistent with the payment of other bonuses. We will be happy to provide your patients a copy of their records at no charge to them . . . .

Dr. Teer stated that, to his knowledge, this was the first notice given to Dr. Vraney that his "employment was going to be terminated sooner than [the date of June 30, 2007, which was contained in] the notice [Dr. Vraney] had given [on March 30, 2007]. Despite knowledge that Dr. Vraney was not working full-time beginning in May 2007, the Clinic's letter, *supra*, states that Dr. Vraney's salary will be paid through the end of May, and that he will also be paid his second quarter bonus at the end of the second quarter of 2007: "You will be paid your salary through the end of May, and your quarterly bonus shortly after the end of the second quarter . . . ."

In his deposition testimony, Dr. Vraney admits that, although his usual custom was to turn in hospital billing sheets (i.e., accounts receivable) to the Clinic for collection once or twice a week, he did not tender his hospital billing statements to the Clinic for collection after May 17, 2007. Rather, Dr. Vraney instructed Advanced Medical to collect his hospital billings after that date. When asked the reason for his failure to tender his hospital billings

-6-

to the Clinic after May 17, Dr. Vraney stated that: "I felt initially that it was a leverage against the money that [the Clinic] owed me." When asked to elaborate on what he thought the Clinic owed him, Dr. Vraney stated:

> Well, at that time, they clearly owed me at least the compensation for the bonus for the second quarter. I felt they also owed me the income for June which they had no right to terminate me from, and they also denied me my vacation time. They owed me money for my retirement fund.

It is undisputed that Dr. Vraney was paid his base salary for the month of May 2007. Concerning the second quarter bonus, as discussed below, there is some dispute in the record as to whether it was necessary for the Clinic to have Dr. Vraney's hospital billing sheets in order to calculate the amount of the bonus. At any rate, the Clinic did not pay Dr. Vraney his second quarter bonus, allegedly because it did not have the billing documentation to calculate the amount of the bonus as Dr. Vraney had tendered these bills to Advanced Medical for collection. It is undisputed that Dr. Vraney did not tender the May 2007 bills that had been collected by Advanced Medical until after this lawsuit was filed, and that Dr. Vraney had the benefit and use of these collected funds during the pendency of the case. It is also undisputed that the collection rate achieved by Advanced Medical was substantially lower than the percentage of collections that had historically been achieved by the Clinic's internal billing practices, *see* discussion *infra*.

### D.  June 2007 and Following

On June 8, 2007, the Clinic's attorney sent a letter to Dr. Vraney's attorney. The substance of the letter was to inform Dr. Vraney's attorney that Dr. Vraney had allegedly made defamatory statements against the Clinic in a letter that Dr. Vraney disseminated to other medical practitioners in the area. Dr. Vraney's letter is undated. However, the Clinic attached, to its June 8, 2007 letter, one of Dr. Vraney's letters, which had allegedly been faxed to a Rutherford County clinic on June 1, 2007 (according to the date printed on the letter by the fax machine). Dr. Vraney's letter was printed on letterhead from Jackson-Madison County General Hospital. Dr. Vraney's letter states, in relevant part:

> Effective immediately I will no longer be associated with Medical Specialty Clinic. I will be making a change in my Pulmonary/Critical Care Practice to exclusively serve patients at Jackson-Madison County General Hospital.

> \*                               \*                               \*

I wish that with this departure I might be able to recommend to you the individuals at Medical Specialty Clinic either as quality physicians or as decent human beings. Unfortunately, after witnessing the business practices of the organization I can only say that they are not guided by anything resembling basic Christian principles.

Despite misinformation disseminated by the clinic to all of my patients I remain in the community and available to assist with problems that may arise. I will not, however, be able to refill prescriptions, forms, etc. for lack of access to patient records.

By its June 8, 2007 letter, the Clinic requested a list of all medical providers to whom Dr. Vraney had sent the foregoing letter. This list was subsequently provided . On or about June 24, 2007, Jim Moss, the President and CEO of Jackson-Madison County General Hospital, sent a letter to the recipients of Dr. Vraney's letter. The hospital's letter states, in relevant part:

Dr. Vraney wrote his letter without the knowledge or approval of Jackson-Madison County General Hospital. Please be assured that the views and statements represented by Dr. Vraney in his correspondence are not those shared by Jackson-Madison County General Hospital. I wish to strongly disassociate not only myself, but the Hospital from anything Dr. Vraney has to say in his letter about the physicians at Medical Specialty Clinic.

## II. PROCEDURAL HISTORY

On February 11, 2008, Dr. Vraney filed a complaint for breach of contract against the Clinic. On May 22, 2008, the Clinic filed its answer to the complaint, denying the material allegations contained therein. Concurrent with its answer, the Clinic filed a counter-complaint against Dr. Vraney. As is relevant to the instant appeal, the Clinic's counterclaims alleged: (1) breach of contract; (2) misappropriation; and (3) breach of the duty of loyalty. Concerning its breach of contract claim, the Clinic's counter-complaint avers that Dr. Vraney breached the contract by: (1) "instruct[ing] scheduling staff with the Clinic to significantly curtail Vraney's scheduling of patients at the Clinic; (2) "limit[ing] the number of days in May 2007 in which he would be available to see patients at the Clinic[, and] refus[ing] to see any patients beyond June 1, 2007, except for urgent or emergency care;" (3) refusing, "[d]uring the month of May 2007 . . . to turn in his Hospital charges to the Clinic, thereby depriving the Clinic of the ability to realize revenues from the Clinic's patients seen by

Vraney at the Hospital;" and (4) "[i]n May 2007, while still employed by the Clinic, [] draft[ing] a letter in which Vraney disparaged the Clinic and its physicians and shareholders," and "publish[ing] [the letter] to a broad group of referring physicians and other healthcare providers . . . ." As the ground for its misappropriation claim, the Clinic restated the fact that Dr. Vraney had withheld his hospital charges "for the last two week period for the month of May," and that he had these charges "paid to himself rather than to the Clinic." Concerning the breach of loyalty claim, the Clinic relied upon Dr. Vraney's alleged retention of the hospital billings for some part of May 2007, and the publication of the allegedly disparaging letter.

Dr. Vraney filed a timely answer to the counter-complaint, denying the material allegations contained therein. By order of August 17, 2009, Dr. Vraney was granted leave to file an amended complaint to add a claim for "breach of oral promise to pay for accrued benefits, as well as a conversion count," and to add additional facts. In relevant part, the amended complaint states:

> 7. Defendant in writing [i.e., the May 22, 2007 letter, *supra*,] reaffirmed its obligation to pay Plaintiff a bonus for the second quarter of 2007. In addition, Defendant agreed to pay an additional sum of $25,000.00 to compensate Plaintiff for accrued but unused benefits including vacation time.
>
> *                              *                              *
>
> 9. In early May 2007, Defendant without notice to the Plaintiff terminated the employment of Mrs. Emison. The effect of the termination of Mrs. Emison's employment was to cripple Plaintiff's ability to see patients in his office. Due to the interference by Defendant, and in order to assist as many patients with needed transition to other physicians was necessary, Plaintiff began to limit the number of new patients he was seeing in May of 2007. During this period, Plaintiff continued to maintain a full load of hospital consults without reduction in productivity.
>
> 10. Plaintiff alleges that the termination of Carol Emison in early May 2007 constituted a constructive discharge of Plaintiff from his employment with Defendant.

On August 29, 2008, and pursuant to a July 2, 2008 motion filed by Dr. Vraney, the

trial court appointed two special masters (one selected by Dr. Vraney, the other by the Clinic) to conduct financial calculations related to damages. The Special Masters' report was filed with the trial court on October 3, 2008. On December 30, 2008, Dr. Vraney filed a motion asking the court to accept the Special Masters' report concerning damages, but asked the court to resolve three issues of contractual interpretation. First, Dr. Vraney argued that, "[b]y terminating [his] employment as of the end of May 2007, [the Clinic] did not give the required 60 day notice under the employment contract." Therefore, Dr. Vraney asked the court to determine the actual date of the termination of his employment, i.e., May 30, 2007 (per the Clinic's May 22, 2007 letter, *supra)*, or June 30, 2007 (per Dr. Vraney's March 30, 2007 letter, *supra*). Next, Dr. Vraney asked the court to determine whether $14,208.05 of "insurance credits," as calculated by the Special Masters, should be deducted from the second quarter gross bonus. Dr. Vraney argued that this deduction had not been taken historically, and that the employment agreement did not provide for such deduction. Finally, Dr. Vraney asked the court to determine the amount to be offset against sums owed to Dr. Vraney by the Clinic. Specifically, Dr. Vraney argued that he had collected professional fees subsequent to the termination of his employment with the Clinic for services rendered while he was still its employee. These fees, which were collected by Advanced Medical, totaled $14,323.05. Because the Clinic allegedly contested the amount, arguing that the amount should be $25,312.00, based upon the historical collection percentage of 56.08% of the amounts billed, Dr. Vraney asked the court to determine the proper amount. Although Dr. Vraney asked the court to determine these specific issues, there is no indication in the record that he waived any of his previous arguments, such as constructive termination, which had been raised in his previous filings with the court.

On January 16, 2009, the trial court held a hearing on certain discovery issues that had been raised by the parties. On March 24, 2009, Chancellor James F. Butler entered a letter ruling. Therein, the court states, in relevant part:

> 3. [Dr. Vraney's] motion to approve the Special Master's Report requests the Court to resolve certain issues of law and perform contractual interpretations. Depending on the contractual interpretations, [Dr.] Vraney requests the Court to then enter judgment. The Court agrees with the Clinic's position that this is in the nature of a motion for summary judgment and that it would be inappropriate to enter such a judgment absent compliance with Rule 56, Tennessee Rules of Civil Procedure. . . .
>
> 4. While the Court may be called on to issue interpretations of law at some point in this case, the Court will not do so at this

time. The Court will accept the Special Master's Report provisionally, but will allow the Clinic to proceed with its discovery of not only the issues raised in the Special Master's Report, but also the issues raised in the Complaint and Counter-Claim.

The court's letter ruling was reduced to an order, which was entered on April 17, 2009.

On July 13, 2009, the Clinic filed a motion for summary judgment, along with a statement of undisputed material facts in support thereof. On September 22, 2009, Dr. Vraney filed a cross-motion for summary judgment, along with a counter-statement of undisputed material facts in support thereof. On April 16, 2010, the Clinic also moved for summary judgment on the claims asserted by Dr. Vraney in his amended complaint, *supra*. The trial court heard the cross-motions for summary judgment on May 14, 2010. At the hearing, the Clinic's attorney argued that, "it's the Court's duty . . . to determine when . . . breach first began. We would argue that the breach [on Dr. Vraney's part] went back to March 1 when Dr. Vraney without knowledge of his employer— of the princip[als] of his employer other than clerical staff began significantly to reduce his schedule . . . ." The Clinic's attorney conceded that, if the trial court did not find March 1 to be the date of breach, then "[a]t the very latest . . . the breach of duty of loyalty period begins on May 17, 2007, and that is the date when Dr. Vraney misstated on all his credentialing applications that his new practice began, and it's the date that he began to misappropriate the hospital charges. . . ." Accordingly, the Clinic argued that it did not owe Dr. Vraney his second quarter bonus, and that Dr. Vraney should be required to disgorge any profits or payments made to him during the period of breach. As an alternative argument, the Clinic argued that Dr. Vraney had breached the contract by failing to work full-time, beginning in May 2007, and that he further breached the contract by sending the allegedly disparaging letters to other medical providers in the area. Dr. Vraney's attorney argued that Dr. Vraney worked well above forty hours per week, usually eighty to ninety hours per week, which would have constituted full-time employment. He further argued that eighty to ninety percent of Dr. Vraney's practice was seeing hospital patients; accordingly, even though Dr. Vraney limited his time with office patients, starting in May 2007, he was nonetheless still seeing hospital patients on a full-time basis during the disputed time period. Dr. Vraney's attorney also argued that, when the Clinic fired Ms. Emison, it "crippled his ability to see patients in the office." In addition, Dr. Vraney argued that the Clinic "did not send out a letter as [it was] required to Dr. Vraney's patients advising them of where he would be [practicing when he left the Clinic]." In failing to disseminate this information, Dr. Vraney argued that the Clinic breached its duty of good faith. Concerning whether Dr. Vraney's withholding of his hospital billings after May 17, 2007 justified the Clinic's failure to pay his second quarter bonus for 2007, Dr. Vraney's attorney stated that "the bonus is calculated upon receipts, not bills," and argued

that the Clinic "knew exactly what had been received as a result of Dr. Vraney's medical services."

Following the hearing, on June 16, 2010, Chancellor Butler issued a second letter ruling, which states, in relevant part that:

> On or about March 30, 2007, Plaintiff issued a resignation letter to the Defendant. At some point in time, the Defendant-Clinic issued it's [sic] letter to Plaintiff advising that his last day at work would be May 30, 2007, instead of June 30, 2007, the date that Plaintiff had put in his letter. There are several things that happened after that, but suffice it to say that the Plaintiff left the Clinic on May 30th or 31st, and went into private practice. Plaintiff had previously set up his practice corporation and had advised certain people who he had to be credentialed with that his practice began May 17, 2007. Between May 17, 2007 and May 31, 2007, Plaintiff continued to see patients and continued on the payroll of Defendant. Plaintiff did not turn in his billing sheet for that period of time and ultimately billed those charges through his own billing service and to the extent those bills were paid, Plaintiff retained the money and did not give it to the Defendant. Thereafter, lawsuits were filed by Plaintiff and Defendant seeking recovery of funds which they both insist are due to them as a result of this corporate divorce.
>
> *                              *                              *
>
> SUMMARY JUDGMENT FILED BY MEDICAL SPECIALTY CLINIC, P.C. ON JULY 13, 2009
>
> The Court will deal initially with the Clinic's Motion for Summary Judgment.
>
> 1. Breach of duty of loyalty claim.—The Clinic takes the position that Plaintiff has breached his duty of loyalty and sets forth several acts upon which they base this claim. Those acts consist of restricting his patient load, incorporating a new practice prior to leaving the Clinic, refusal to turn in hospital billing sheets for an approximate two week period, and then billing those charges and keeping the monies received for

himself. Further, they allege he represented to various medical payors or agencies that his practice began on May 17, 2007, although he was still employed full time and exclusively by the Clinic through May 31, 2007, thus, allowing him to bill Clinic patient revenue through his clinic. Further, Clinic alleges Plaintiff published disparaging letters to physicians in the West Tennessee area. Plaintiff admitted all of these charges but contends that they do not support summary judgment. Defendant has responded to those charges giving his explanations, showing that he did not restrict his patient load, but simply made it more manageable. He points out that incorporating a practice is not an act of disloyalty, nor hiring a billing service, but were simply preparations for leaving. Plaintiff also attempted to set out his position on the diversion of funds. Plaintiff claims to have been confused as to his ending date and that while he may have made a mistake in judgment or committed negligence, he denies an intentional act. Plaintiff explained when he named the starting date of his private practice as May 17, 2007, he was confused about which day he had actually been terminated, whether it was the date he got the letter, or the date the letter said he was to leave. Concerning the letters that were sent to several physicians in the area, Plaintiff explained his reasoning for sending those letters as notice to referring physicians that he was leaving the Clinic and denied he was attempting to interfere with the Clinic's relationship with these physicians. Further, that the letters were written after May 17th and there is an issue as to whether that was his termination date or not. He further stated that the Clinic had presented no evidence that it's [sic] reputation or revenue was harmed due to the letters and the letters were not improper since the non-solicitation covenant in Plaintiff's contract with the Clinic was unenforceable. Plaintiff also alleges that even if he did breach his duty of loyalty, that the Clinic is only entitled to money gained by him during the period of the breach which at best would have been May 17, to May 30, 2007.

The Court finds that while several of the items relied upon by the Clinic to support it's [sic] claim of a breach of duty of loyalty involve genuine issues of fact, the one claim pertaining to the billing statements and the collection of funds from those

statements presents much more of a problem for the Plaintiff. Plaintiff clearly continued to see patients on behalf of the Clinic during the period from May 17–30, 2007. He should have turned in the billing sheets as he had in the past. Even if there was some confusion about it, there is no genuine issue of fact that Plaintiff turned those billing sheets in to his new billing service, collected the funds, put them into his bank account and has them to this day. Plaintiff did not disclose this to the Clinic for many months thereafter. At the same time, Plaintiff was demanding payment of a bonus from the Clinic based on those charges. The Clinic could not pay the bonus until the collections were known. Plaintiff admits that he received the letter terminating him as of May 30, 2007, and with the Clinic agreeing to pay him his salary through the end of May as well as his bonus. However, as of May 17, 2007, Plaintiff stopped turning in his hospital charges to the Clinic's billing staff. While Plaintiff claims an honest confusion, he does not dispute the error in handling the billing sheets and keeping the money. Plaintiff seeks the Court to accept an off-set of these funds against what he claims the Clinic would owe him for salary and bonus. There can only be one conclusion. Plaintiff did in fact breach his duty of loyalty to the Clinic in the taking of these funds and retaining them. Plaintiff had no ownership in the funds or the Clinic's accounts receivable. The Plaintiff took control of those funds and decided how they would be utilized. Plaintiff also ran the risk on his own of collection which ultimately did not produce the historical collection rate of the Clinic. It would appear that several months went by before the bills were sent by Plaintiff's new billing service. As a matter of law, Plaintiff's actions constitute a breach of the fiduciary duty of loyalty. Therefore, the Clinic is entitled to summary judgment on this claim.

[Defendant] further claims that as a result of the breach of duty of loyalty, the Plaintiff should be required to disgorge any profits or benefits he received as a result of his disloyal activities. The Clinic points out that Plaintiff billed approximately $45,136.00 of Clinic bills to his new practice. Plaintiff's historical collection rate is admitted to be 56.08% when charges are turned in two times per week for billing.

-14-

Plaintiff's billing agent only received about $14,323.05, which is a substantially less percentage of collection than the Clinic's historical collection rate. The parties dispute as to how much the Plaintiff owes the Clinic as a result. Is it the amount the Clinic reasonably would have collected historically, or is it the amount actually collected? There are several factors that may bear on that determination and the Court is not prepared to make any ruling on that issue in this setting.

2. Breach of employment agreement—The Clinic claims that it is entitled to summary judgment on it's [sic] claim of breach of employment agreement by the Plaintiff. In support thereof, Clinic points out that Plaintiff's employment was exclusive and full-time, that he had no financial interest in his account's receivable and that Plaintiff agreed not to influence any referral source to terminate that relationship during the employment period and for two years thereafter. Clinic points out that Plaintiff violated this by working for himself during the May 17-May 30th time period, as well as being on salary with the Clinic. Plaintiff admits he had no financial interest in the accounts receivable, although he took the billing statements and billed them and kept the proceeds. Plaintiff admits sending the letter referred to which somewhat disparaged the individuals in the Clinic, although he did not refer to any specific acts which formed the basis of his opinion of the Clinic's other physicians. Plaintiff, on the other hand asserts confusion on his part as to the termination date. He disputes the character of the letters sent, and points to the fact that he did not misappropriate patient revenue funds because of the confusion regarding the actual existence of the employment relationship itself during this time frame.

The Court finds that there are genuine issues of material fact concerning the confusion claim by Plaintiff, and as to the nature and intent of the letters. However, the Court can find no genuine issue of material fact concerning Plaintiff's appropriat[ion] of the accounts receivable, billing them and keeping the money. Therefore, Plaintiff clearly did breach his employment agreement in this regard and the Clinic is entitled to summary judgment on this claim as a matter of law.

\*                                    \*                                    \*

4. <u>Misappropriation/Conversion claim</u>—the Clinic claims that Plaintiff misappropriated or converted it's [sic] property to himself. In order to do that, Plaintiff must have wrongfully appropriated the tangible property of another to his own use in exclusion or defiance of the owner's rights. Conversion is an intentional tort and a party seeking to make out this case must prove (1) the appropriation of another party's property to one's own use and benefit, (2) by the intentional exercise of dominion over it, (3) in defiance of the true owner's rights. To be liable, the one charged need only to have an intent to exercise dominion and control over the property that is in fact inconsistent with the other party's rights, and do so. Good faith is generally immaterial. The Clinic says this is exactly what happened. Plaintiff, in response, points to the great confusion which he alleges surrounded the actual existence of the employment relationship in the time frame in question.

As stated above, when dealing with an intentional act, summary judgment is rarely granted. It is conceivable that the Plaintiff could in fact present a convincing case of confusion as to his employment status. While there is little question that he owes the money back, there is a genuine issue of material fact concerning whether or not the conversion or misappropriation was intentional. Therefore, the Court declines to grant summary judgment on these claims.

The court then turned to address Dr. Vraney's motion for summary judgment. The court ultimately denied summary judgment in favor of Dr. Vraney. In relevant part, the court held:

As to whether the Clinic breached its duties of notification, the Court will be required to weigh the evidence on this point one way or the other. There are genuine issues as to what knowledge the Clinic had in its possession with which to properly comply with the rules and regulations referred to and whether or not they complied by using the information they allegedly had. The Clinic is not required to prove it's [sic] case or even respond to Plaintiff's Motion unless Plaintiff has been

-16-

able to effectively negate the Plaintiff's claim of improper motive. One's motives are a question of fact. Simply denying a claim does not effectively negate the claim.

As to the monies claimed by Plaintiff to be owed to him by the Clinic, there are genuine issues and disputes which require a factual determination of not only the numbers, but of past history and practices, and as to promises made or not made, or if made, why they were later withdrawn. There are many issues of fact and each will have their own versions. The Court is not to weigh the evidence at this stage. If there is a genuine dispute, the Court's duty is to simply overrule the Motion and let the matter proceed to trial . . . .

The June 16, 2010 letter ruling was reduced to an order, which was entered in the trial court on September 30, 2011. Following the June 16, 2010 letter ruling, the trial court had granted summary judgment in favor of the Clinic on both its breach of loyalty claim and on its breach of contract claim, and had denied Dr. Vraney's motion for summary judgment in its entirety. The case proceeded.

On November 2, 2010, Chancellor Butler issued a third letter ruling, wherein the court states, in relevant part:

[T]he Court has had an opportunity to review the Special Master's Report filed October 3, 2008. The Court has come to the following conclusions based on that review and also our court hearing of last week:

1. The appropriate collection rate to use is 56.08%, which is the Clinic rate. The Court directs the use of this historical collection rate because Dr. Vraney has no interest in the accounts receivable. Any confusion he may have felt is not sufficient to justify his billing the charges through his collection agency and retaining the receipts during the period from May 17, 2007 through May 31, 2007. Dr. Vraney further admits that he did not handle this properly. The Court finds the Clinic should not be required to suffer the loss resulting from Dr. Vraney's misstep. Therefore, the Court instructs the use of the historical Clinic collection rate referred to in the report.

2. Concerning the insurance credits which were deducted from the 2007 second quarter gross bonus, the Court is still unable to decide on the merits of the deductions. The Court still does not understand or know what these credits consist of and whether or not they have been historically deducted in the past prior to Dr. Vraney's last quarter . . . .

3. The employment period ran through May 31, 2007. The Court rejects the notion that it ran through June, 2007. The period of breach runs from May 17, 2007 through May 31, 2007. It is the Court's persuasion that disgorgement would be tied to those dates, and not the entire quarter. The disgorgement would apply to Dr. Vraney's pro-rata salary for the period of breach, and all bonus earned in the period of breach.

4. As to vacation time and the issue relative to that, the Court finds this is a fact issue which we have already discussed and is not appropriate for ruling without proof and testimony.

The letter ruling was reduced to an order, which was entered on September 30, 2011. Following the November 2, 2010 letter ruling, the case was referred back to the Special Masters to answer some of the Court's questions. On May 16, 2011, the Special Masters filed a supplemental report, stating, in relevant part:

The Special Masters have determined that insurance credits were not deducted from the gross bonus calculations for the prior twelve months.

[Pursuant to Paragraph 3 of the trial court's November 2, 2010 ruling], [t]he Special Masters have recalculated the bonus that would be available as of May 17, 200[7]. We are unaware if the Chancellor was asking for us to refigure in regard to paragraph 3, but we feel compelled to at least address the issue and provide the figures that can be reviewed by all parties . . . .

As our charge in the appointment was to determine the amounts, if any, due from Medical Specialty Clinic to Dr. Vraney and amounts, if any, due from Dr. Vraney to Medical Specialty Clinic, we submit the following:

-18-

MSC to VRANEY:

If employment agreement through May 31, 2007 without
insurance credits           $58,188.42

If employment agreement through May 31, 2007 with insurance
credits deducted           $43,980.37

VRANEY TO MSC:

If employment agreement ended May 17, 2007 the bonus
shortfall without insurance credits       $8,363.62

If employment agreement ended May 17, 2007 the bonus
shortfall with insurance credits       $22,571.67

Per Item 1 in [] Chancellor Butler's letter dated November 2,
2010, Dr. Vraney will be required to remit 56.08% of charges
for May 17 – May 31, 2007. This amount was determined to be
$25,312.

On May 16, 2011, the Clinic moved the court for a judgment in conformity with the Special Masters' findings. A hearing on the motion was held on July 19, 2011. On July 29, 2011, Chancellor Butler issued a fourth letter ruling, which states, in pertinent part:

A. The Clinic does not owe Dr. Vraney any sums of money, with the possible exception of vacation pay which is an issue yet to be decided.

B. Dr. Vraney owes to the Clinic $33,675.62. This is based on the accounting which has been approved by both Special Masters for each party.

The court also awarded the Clinic prejudgment interest on the amounts set forth in Item B, from May 31, 2007 to the date of payment at a rate of 10% per annum.

On August 3, 2011, Dr. Vraney filed a motion for findings of fact and conclusions of law in accordance with Tennessee Rule of Civil Procedure 52.01; an amended motion was filed on August 9, 2011 to correct a typographical error. On August 16, 2011, the trial court entered its findings of fact and conclusions of law, to wit:

1.  Based upon the findings of the Court previously made, the Court finds that Plaintiff breached his duty of loyalty to Medical Specialty Clinic by appropriating Clinic assets for his own use, to wit, his billings from May 17 through May 31, 2007, without the Clinic's knowledge or consent. Vraney turned those billings in to a billing collection agency retained solely by him, effected the collection of a portion of those billings, and utilized the funds in his new practice without remitting any of said funds to the Clinic or turning the billings over to the Clinic for their collection process. The Court finds this was an intentional violation of his breach of duty of loyalty to the Defendant, and that he should be required to disgorge any compensation tied to the date between May 17, 2007 and May 31, 2007, which would include any salary and bonus earned or accrued during this period of breach.

2.  The Court has previously found that the Plaintiff's employment ran through May 31, 2007 and not through June 30, 2007 as urged by the Plaintiff. The June 30th date was a date through which the Plaintiff himself offered to work, but in fact did not work after he was terminated.

3.  The original Masters Report, filed with this Court on October 3, 2008, was a report prepared by each parties' CPA, working together as a Special Master for the Court . . . . The original report is incorporated by reference herein. The bottom line on that report was that the Clinic owed Vraney, through May 31, 2007, without insurance credits, the sum of $58,188.42. Further, that Vraney owed the Clinic projected collections if the Clinic had billed them at their collection rate, the sum of $25,312.00.

4.  The Court subsequently determined that the appropriate collection rate to use in calculations of the collection of the billings taken by Dr. Vraney was 56.08%, which was the Clinic's historical collection rate, rather than the actual rate achieved by Vraney. The Masters ultimately determined that no insurance credits had been deducted from bonus calculations in the past twelve months [and], therefore, would not be an appropriate deduction at this time.

5. Thus, based on the report, as of May 31, 2007, Vraney would have been due from the Clinic $58,188.42 and that Clinic would be due from Vraney, $25,312.00, which would be a net $32,876.42 to Vraney.

6. After the Court ruled on the rate of collection to use and set the employment period ending as of May 31, 2007, and determined the period of breach and disgorgement to be May 17 through May 31, 2007, the Special Masters then working together, after determining insurance credits were not deducted from the gross bonus calculation for the prior twelve month, set about to recalculate the bonus available to Vraney as of May 31, 2007.

7. The Special Masters filed a second report on May 16, 2011 and . . . it was utilized by the Court at the hearing . . . . The Court finds the conclusion of both Vraney's and the Clinic's CPAs/Special Masters, is that as of May 17, 2007, Vraney owed the Clinic $8,363.62 as a bonus short fall without insurance credits. In addition, the Special Masters concluded Vraney owed the Clinic 56.08% of the charges he took between May 17–May 31, 2007, which totals $25,312.00.

8. The Court finds that as a result of the above, the total amounts owed by Vraney to the Clinic are the two amounts set forth in the paragraph above, which total $33,675.62.

9. There is considerable disagreement between the parties and counsel as to what the Court has ruled in it's [sic] letter ruling dated November 2, 2010. On that date, the Court issued a letter ruling which, among other things, held that the employment period of Dr. Vraney ran through May 31, 2007. The period of breach resulting in a disgorgement ran from May 17, 2007 through May 31, 2007. It is the Court's intention that Dr. Vraney is entitled to all salary and bonuses accrued up through May 16, 2007, i.e., if his bonus is calculated based on billings actually collected and in the hands of the Clinic, then whatever had been collected from Dr. Vraney's billings by the Clinic up through May 16, 2007 should be utilized in computing his bonus for May, 2007. Whatever of Dr. Vraney's billings were

collected and in the hands of the Clinic after May 16, 2007, would not be used to calculate his bonus. It appears to the Court that this is what the Special Masters did when they added the second column to the December 9, 2010 report. Under the Court's ruling, Dr. Vraney would forfeit all rights to bonus on collections that were based on his prior billings which were received by the Clinic and posted after May 16, 2007. His right to collect his income earned and bonus on collections received by the Clinic after the date is stopped based on the Court's ruling.

Dr. Vraney has urged the Court to acknowledge that he was owed a bonus of $58,188.42 at the end of May, 2007. That figure is predicated on using the entire collections for May, 2007 on Dr. Vraney's billings ($108,174.82). However, based on the Court's ruling, Dr. Vraney forfeits all bonus money on collections made after May 16, 2007. According to the bonus calculation sheet provided to the Court by Medical Specialty Clinic, Dr. Vraney ended the month of April, 2007 with a bonus shortfall of $12,534.18 because he took a bonus in that month of $84,532.09. Thus, he started the month of May, 2007 with a $12,534.18 bonus shortfall. Starting there, and based on collections for May 1, 2007 through May 16, 2007 ($31,650.34) Dr. Vraney has a bonus shortfall for May, 2007, of $8,363.62.

\*                              \*                              \*

11. The Special Masters noted that Dr. Vraney was paid his full salary for the month of May, 2007 and that the amount that could be disgorged from that salary which would have accrued after May 16, 2007, was $6,250.00. However, they did not utilize that figure in arriving at their calculations of amounts due to the Clinic from Vraney. The Court awarded prejudgment interest to the Clinic at a rate of 10% per annum . . . .

On February 24, 2012, Chancellor Butler entered an order of recusal and interchange. Therein, Chancellor Butler states that he "has a potential or perceived conflict of interest which would prevent him from hearing the case, or one of the parties has requested the Court to recuse." Chancellor Tony Childress was named in Chancellor Butler's order of recusal as his replacement, although there is no order of appointment or interchange in the record. On February 28, 2012, Chancellor Butler entered his last order in this case. The February

28, 2012 order reiterates Chancellor Butler's previous rulings and dismisses with prejudice "[a]ll other claims by the parties inconsistent with this Order." However, Chancellor Butler specifically reserves the remaining issue of whether Dr. Vraney is entitled to compensation for unused vacation time.

On August 7, 2012, Chancellor Childress held a hearing on the sole remaining issue of "whether or not the plaintiff, George R. Vraney, M.D., and the Defendant entered into a contract wherein Dr. Vraney was to receive $25,000.00 from the Defendant for unused vacation time." By order of August 20, *see infra*, Chancellor Childress denied and dismissed Dr. Vraney's claim to recover $25,000.00 for any unused vacation time.

## III.  ISSUES

Dr. Vraney appeals.  He raises seven issues for review as stated in his brief:

> 1.  Whether the trial court erred in granting summary judgment to Appellee on its breach of the duty of loyalty claim where questions of fact existed as to Appellant's bad faith intent to directly compete with his employer?
>
> 2.  Whether the trial court erred in implicitly granting summary judgment to Appellee on Appellant's breach of contract claim where Appellee never demonstrated that Appellant could not have succeeded on this claim at trial?
>
> 3.  Whether the trial court erred in implicitly granting summary judgment to Appellee on Appellant's conversion claim where Appellee failed to produce affirmative evidence to negate any element of Appellant's claim that Appellee intentionally withheld Appellant's second quarterly bonus, or, in the alternative, where genuine issues of material fact exist as to whether the elements of conversion have been met?
>
> 4.   Whether the trial court erred in awarding damages to Appellee in the amount of $33,675.62 where the measure and amount of damages is not supported by the record?
>
> 5.   Whether the trial court erred in ruling that Appellant's employment ran through May 31, 2007, where the material evidence reflects that Appellant's employment ended on May

30, 2007?

6. Whether the trial court erred in ruling that Appellant did not accept Appellee's offer of $25,000.00 in exchange for working without vacation time where the preponderance of the evidence demonstrates that there was an acceptance followed by an unsuccessful attempt at modification?

7. Whether, as an alternative to issues (1) through (5), the initial trial judge improperly failed to disclose his conflict of interest until resolving all claims except for that of breach of oral contract?[1]

## IV. RECUSAL

We begin our discussion with Dr. Vraney's last issue concerning Chancellor Butler's

---

[1] As a point of practice, we note that Tennessee Rule of Appellate Procedure 24(a) provides, in relevant part, that:

> The following papers filed in the trial court are excluded from the record: (1) subpoenas or summonses for any witness or for any defendant when there is an appearance for such defendant; (2) **all papers relating to discovery, including** depositions, **interrogatories and answers thereto**, reports of physical or mental examinations, requests to admit, and all notices, motions or orders relating thereto; (3) any list from which jurors are selected; and (4) trial briefs; and (5) minutes of opening and closing of court. Any paper relating to discovery and offered in evidence for any purpose shall be clearly identified and treated as an exhibit. **No paper need be included in the record more than once**.

*Id.* (emphases added).

This record contains several volumes, in large part due to the inclusion of various discovery materials, and inclusion of the same documents numerous times. It is too often the case that an Appellant includes all filings made in the trial court and every portion of the transcript of the hearing (including arguments of counsel) in contravention of the foregoing Rule of Appellate Procedure. The problem with inclusion of extraneous filings that are clearly excluded from the appellate record is that it places upon this Court a duty that falls to the Appellant-to prepare a correct and complete record on appeal. Tenn. R. App. P. 24(b). In making that record, the Appellant should adhere to the mandates contained in Tennessee Rule of Appellant Procedure 24(a). This Court endeavors to file its opinions in a timely manner; however, when placed in the position of having to review volumes of extraneous, unnecessary, and irrelevant filings, our goal is hindered and the interests of judicial economy are stymied.

-24-

recusal. As noted above, Chancellor Butler entered an order of recusal on February 24, 2012, stating, that he "has a potential or perceived conflict of interest which would prevent him from hearing the case, or one of the parties has requested the Court to recuse." There is nothing in the record from which we can discern the exact "conflict of interest" to which Chancellor Butler refers in his order. At any rate, the recusal order was entered prior to July 1, 2012, which is the effective date of current Tennessee Supreme Court Rule 10(B); thus, the former legal principles apply. *Baker v. Baker*, No. M2010–01806–COA–R3–CV, 2012 WL 764918, at \*6 (Tenn. Ct. App. Mar.9, 2012). Under the Code of Judicial Conduct in effect prior to July 1, 2012, decisions concerning recusal are addressed to the discretion of the judge asked to be recused and "the judge's decision will not be reversed on appeal unless a clear abuse appears on the face of the record." *See State v. Hines*, 919 S.W.2d 573, 578 (Tenn.1995). "If a discretionary decision is within a range of acceptable alternatives, we will not substitute our judgment for that of the trial court simply because we may have chosen a different alternative." *White v. Vanderbilt Univ.*, 21 S.W.3d 215, 223 (Tenn. Ct. App. 1999). "An abuse of discretion occurs when the trial court causes an injustice by applying an incorrect legal standard, reaches an illogical result, resolves the case on a clearly erroneous assessment of the evidence, or relies on reasoning that causes an injustice." *Id.* (citing *Wright ex rel. Wright v. Wright*, 337 S.W.3d 166, 176 (Tenn. 2011); *Henderson v. SAIA, Inc.*, 318 S.W.3d 328, 335 (Tenn. 2010)). In determining whether the trial court abused its discretion, an appellate court "should presume that the [trial court's] decision is correct and should review the evidence in the light most favorable to the decision." *Gonsewski v. Gonsewski*, 350 S.W.3d 99, 105–06 (Tenn. 2011); *see also* Tenn. R. App. P. 13(d) ("[R]eview of findings of fact by the trial court in civil actions shall be *de novo* upon the record of the trial court, accompanied by a presumption of the correctness of the finding [s], unless the preponderance of the evidence is otherwise."). Based upon the record before us, and specifically the lack of information concerning Chancellor Butler's perceived conflict, we are unable to conclude that the trial judge abused his discretion in entering an order of recusal.

Moreover, there is no indication that either party objected, at the trial level, to the Chancellor's recusal, or made any argument that his rulings, prior to the date of recusal, were invalid based upon the fact that the Chancellor did not recuse himself from the case at some earlier date. In fact, it appears from the record that this argument is raised for the first time on appeal. It is well settled that issues not raised at the trial level are considered waived on appeal. *Waters v. Farr*, 291 S.W.3d 873, 918 (Tenn. 2009) (stating that issues not raised in the trial court are waived on appeal); Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error."). Therefore, based upon either the fact that there is no evidence in the record concerning the ground for recusal, or, in the alternative, because Dr. Vraney has raised this

issue for the first time on appeal, we cannot conclude that the trial court erred in entering an order of recusal.

## V. VACATION TIME

Dr. Vraney also appeals Chancellor Childress' determination that the Clinic does not owe Dr. Vraney any monies for unused vacation time. Concerning the issue of payment for unused vacation time, in his August 20, 2012 order, the Chancellor found:

> Under paragraph 6 of his employment contract Dr. Vraney was not entitled to be paid for vacation time that was not taken. On or around April 1, 2007, however, Dr. Hollis, who was the president of the Defendant, offered on behalf of the Defendant to pay Dr. Vraney $25,000.00 for his unused vacation time provided that Dr. Vraney worked a full schedule through July 1, 2007 and that he not "badmouth" the Defendant. Since he was the president of the Defendant, Dr. Hollis had the authority to make this offer.

> Dr. Vraney did not accept this offer. Instead, he attempted to have the Defendant increase the monetary portion of the offer. By letter dated May 9, 2007, Dr. Vraney's counsel at the time mailed Dr. Hollis a letter wherein it was stated that Dr. Vraney "has authorized me to propose a buyout of his vacation time by Medical Specialty Clinic in the amount of $50,000.00." This letter was a counteroffer to the Defendant's April 1, 2007 offer. The Defendant did not accept Dr. Vraney's counteroffer, and the evidence did not establish that the Defendant ever extended another offer to Dr. Vraney. By letter dated May 22, 2007, the Defendant notified Dr. Vraney that his employment with it would end as of May 30, 2007, and May 30, 2007, was Dr. Vraney's last day of work for the Defendant.

This issue was not decided by summary judgment; rather the Chancellor decided this issue upon evidence presented at the August 7, 2011 hearing. Accordingly, we review the issue *de novo* upon the record with a presumption of correctness of the findings of fact by the trial court. Unless the evidence preponderates against the findings, we must affirm, absent error of law. *See* Tenn. R. App. P. 13(d). Questions of law are reviewed *de novo*, with no presumption of correctness. Tenn. R. App. P. 13(d).

As correctly determined by the Chancellor, the parties' employment agreement specifically states that unused vacation time cannot "be carried over to succeeding years, nor do we pay for time not taken." Accordingly, in order for Dr. Vraney to be entitled to payment for his unused vacation time, there would have to be a finding that the parties entered into a separate agreement, which would take precedence over the original agreement's preclusion of payment for unused time.

The requisites for forming a valid contract are well settled. Contracts require an offer, *Mason v. Pearson*, 668 S.W.2d 656, 660 (Tenn. Ct. App. 1983), an effective acceptance of the offer, *Pinney v. Tarpley*, 686 S.W.2d 574, 580 (Tenn. Ct. App. 1984), and consideration. *Campbell v. Matlock*, 749 S.W.2d 748, 752 (Tenn. Ct. App. 1987). A contract must result from a meeting of the minds in mutual assent to the terms, and be free from fraud or undue influence, not against public policy and sufficiently definite to be enforced. *Higgins v. Oil, Chem. and Atomic Workers Int'l Union, Local 3-677*, 811 S.W.2d 875, 879 (Tenn. 1991); *Peoples Bank of Elk Valley v. ConAgra Poultry Co.*, 832 S.W.2d 550, 553 (Tenn. Ct. App. 1991). Unless required by law, contracts need not be in writing to be enforceable. *Bill Walker & Assocs., Inc. v. Parrish*, 770 S.W.2d 764, 771 (Tenn. Ct. App. 1989). Oral contracts are enforceable, but persons seeking to enforce them must prove mutual assent to the terms of the agreement and must also demonstrate that the terms of the contract are sufficiently definite to be enforceable. *Castelli v. Lien*, 910 S.W.2d 420, 426 (Tenn. Ct. App.1995). Mutual assent need not be manifested in writing. It may be manifested, in whole or in part, by spoken words or by other acts or failure to act. *Cole-McIntyre-Norfleet, Co. v. Holloway*, 685, 214 S.W. 817, 818 (Tenn. 1919); Restatement (Second) of Contracts § 19(1) (1979). Whether a new contract was made is a question of law, which we review *de novo*, with no presumption of correctness. Tenn. R. App. P. 13(d). The question here is whether Dr. Vraney and the Clinic entered into a new agreement, which replaced or modified the terms of the original employment agreement on the subject of payment for Dr. Vraney's unused vacation time.

Dr. Vraney and Dr. Hollis entered into negotiations sometime in March, 2007 concerning Dr. Vraney's compensation, including payment for any unused vacation time. According to Dr. Vraney's deposition testimony, he and Dr. Hollis, the "functioning President of the Clinic," had a discussion sometime in late April or early May 2007. The purpose of the meeting was to discuss Dr. Vraney's unused vacation time. According to Dr. Vraney's testimony:

> A. Dr. Hollis agreed at that [meeting] that if I did not take vacation time as part of my—the end of my time with the clinic, that he would compensate me with an additional $25,000.

Q. Okay. And did you agree that that was a reasonable thing to do?

A. I did.

Dr. Vraney further testified that this was a private conversation between himself and Dr. Hollis and that no other Clinic employees or partners were involved. When asked what he was obligated to do for the $25,000, Dr. Vraney testified that he was "[t]o work through the end of June." At the August 7, 2011 hearing, Dr. Vraney reiterated that he had interpreted Dr. Hollis's $25,000.00 offer to be an "offer of payment for vacation time only."

We need not determine whether the Clinic's proposed $25,000.00 payment constituted an offer for purposes of creating a new contract between the parties because Dr. Vraney clearly rejected this offer and made a counter-offer in the May 9, 2007 letter, which was sent to Dr. Hollis by Dr. Vraney's attorney. Therein, Dr. Vraney states that he has authorized his attorney "to propose a buyout of his vacation time . . . in the amount of $50,000.00."

As discussed in 1 E. Allan Farnsworth, Farnsworth on Contracts § 3.20, at 165 (3d ed. 2004):

> Rejection by the offeree terminates the power of acceptance . . . . A manifestation of intention by the offeree is a rejection if it gives the offeror reason to believe that it is the offeree's intention not to accept the offer . . . .
>
> This is usually the effect of a counteroffer, an offer "relating to the same matter as the original offer." [I]t is ordinarily reasonable for the offeror to believe that the offeree intends to take only one proposal under consideration at a time and therefore to believe that an offeree that makes a counteroffer does not intend to accept the original offer."

*Id*. (footnotes omitted); *see also **In re New Era Resorts**, 238 B.R. 381, 385 (Bankr. E. D. Tenn. 1999) ("An acceptance that fails to mirror an offer is no acceptance at all, but is a rejection of the offer and a counter-offer."). Therefore, when Dr. Vraney made his counteroffer, i.e., $50,000.00 for unused vacation time, the effect was a rejection of the $25,000.00 offer made by the Clinic and a termination of Dr. Vraney's power to accept the $25,000.00. It is undisputed here that the Clinic did not accept Dr. Vraney's counter-offer, and there is no indication that the parties negotiated further on this subject. Accordingly, the trial court correctly concluded that there was no new agreement concerning unused vacation time. Rather, the parties' dealings on this issue never went further than the negotiation phase

and, at any rate, did not proceed to contract manifestation through satisfaction of the basic *prima facie* requirements of offer and acceptance. Accordingly, we affirm the order regarding the vacation time dispute.

## VI. SUMMARY JUDGMENT

### A. Standard of Review

A trial court's decision on a motion for summary judgment presents a question of law. Our review is, therefore, *de novo* with no presumption of correctness afforded to the trial court's determination. *Bain v. Wells*, 936 S.W.2d 618, 622 (Tenn. 1997). "This Court must make a fresh determination that the requirements of Tennessee Rule of Civil Procedure 56 have been satisfied." *Mathews Partners, L.L.C. v. Lemme*, No. M2008-01036-COA-R3-CV, 2009 WL 3172134, at *3 (Tenn. Ct. App. Oct. 2, 2009) (citing *Hunter v. Brown*, 955 S.W.2d 49, 50–51 (Tenn. 1977)).

When a motion for summary judgment is made, the moving party has the burden of showing that "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Tenn. R. Civ. P. 56.04. The moving party may accomplish this by either: (1) affirmatively negating an essential element of the non-moving party's claim; or (2) showing that the non-moving party will not be able to prove an essential element at trial. *Hannan v. Alltel Publ'g Co.*, 270 S.W.3d 1, 8–9 (Tenn. 2008). However, "[i]t is not enough for the moving party to challenge the nonmoving party to 'put up or shut up' or even to cast doubt on a party's ability to prove an element at trial." *Id*. at 8. If the moving party's motion is properly supported, "[t]he burden of production then shifts to the nonmoving party to show that a genuine issue of material fact exists." *Id.* at 5 (citing *Byrd v. Hall*, 847 S.W.2d 208, 215 (Tenn. 1993)). The non-moving party may accomplish this by: "(1) pointing to evidence establishing material factual disputes that were overlooked or ignored by the moving party; (2) rehabilitating the evidence attacked by the moving party; (3) producing additional evidence establishing the existence of a genuine issue for the trial; or (4) submitting an affidavit explaining the necessity for further discovery pursuant to Tenn. R. Civ. P. 56.06." *Martin v. Norfolk S. Ry. Co.*, 271 S.W.3d 76, 84 (Tenn. 2008) (citations omitted).

When reviewing the evidence, we must determine whether factual disputes exist. In evaluating the trial court's decision, we review the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in the non-moving party's favor. *Stovall v. Clarke*, 113 S.W.3d 715, 721 (Tenn. 2003). If we find a disputed fact, we must "determine whether the fact is material to the claim or defense upon which summary judgment is predicated and whether the disputed fact creates a genuine issue for trial."

*Mathews Partners*, 2009 WL 3172134, at *3 (citing *Byrd*, 847 S.W.2d at 214). "A disputed fact is material if it must be decided in order to resolve the substantive claim or defense at which the motion is directed." *Byrd*, 847 S.W.2d at 215. A genuine issue exists if "a reasonable jury could legitimately resolve the fact in favor of one side or the other." *Id*. "Summary [j]udgment is only appropriate when the facts and the legal conclusions drawn from the facts reasonably permit only one conclusion." *Landry v. South Cumberland Amoco, et al.*, No. E2009-01354-COA-R3-CV, 2010 WL 845390, at *3 (Tenn. Ct. App. March 10, 2010) (citing *Carvell v. Bottoms*, 900 S.W.2d 23 (Tenn. 1995)). However, if there is any uncertainty concerning a material fact, then summary judgment is not the appropriate disposition. As stated by our Supreme Court in *Evco Corp. v. Ross*, 528 S.W.2d 20 (Tenn. 1975):

> The summary judgment procedure was designed to provide a quick, inexpensive means of concluding cases, in whole or in part, upon issues as to which there is no dispute regarding the material facts. Where there does exist a dispute as to facts which are deemed material by the trial court, however, or where there is uncertainty as to whether there may be such a dispute, the duty of the trial court is clear. He [or she] is to overrule any motion for summary judgment in such cases, because summary judgment proceedings are not in any sense to be viewed as a substitute for a trial of disputed factual issues.

*Id*. at 24–25.

To the extent that the summary judgment issues presented in this case involve the interpretation of the parties' employment agreement, we note that the court's initial task in construing a contract is to determine whether the language of the contract is ambiguous. *Planters Gin Co. v. Federal Compress & Warehouse Co., Inc.*, 78 S.W.3d 885, 890 (Tenn. 2002). Summary judgment is appropriate in contract cases where the terms of the contract are not ambiguous making the issue a pure question of law. *Id*. If the terms of the contract are ambiguous, then the court applies established rules of construction to determine the parties' intent. *Id*. "Only if ambiguity remains after the court applies the pertinent rules of construction does [the legal meaning of the contract] become a question of fact such that summary judgment is not proper." *Id*.

Ultimately, the court's task is to discern and to honor the intent of the contracting parties. *Bob Pearsall Motors, Inc. v. Regal Chrysler–Plymouth, Inc.*, 521 S.W.2d 578, 580 (Tenn.1975). "The central tenet of contract construction is that the intent of the contracting parties at the time of executing the agreement should govern." *Planters Gin*, 78 S.W.3d at

890. In ascertaining and giving effect to the contracting parties' intentions, where the parties have reduced their agreement to writing, courts look to the parties' intentions as reflected in the language of contract itself. *Frizzell Constr. Co. v. Gatlinburg, L.L.C.*, 9 S.W.3d 79, 85 (Tenn.1999). "The intent of the parties is presumed to be that specifically expressed in the body of the contract . . . ." *Planters Gin*, 78 S.W.3d at 890. Therefore, the court's role in resolving disputes regarding the interpretation of a contract is to ascertain the intention of the parties based upon the usual, natural, and ordinary meaning of the language used. *Guiliano v. Cleo, Inc.*, 995 S.W.2d 88, 95 (Tenn. 1999). Where the language of the contract is clear and unambiguous, its literal meaning controls the outcome of contract disputes. *Planters Gin*, 78 S.W.3d at 890. Stated another way, where terms of the agreement are clear and unambiguous, the courts must wholly ascertain the parties' intent from the plain and ordinary meaning of those terms. *Bob Pearsall Motors*, 521 S.W.2d at 580; *Ballard v. North American Life & Casualty Co.*, 667 S.W.2d 79, 82–83 (Tenn. Ct. App. 1983); *Sutton v. First Nat'l Bank*, 620 S.W.2d 526, 530 (Tenn. Ct. App. 1981).

## B. Breach of Contract

We note at the outset that there are myriad disputes of fact and law in this case, which preclude the grant of summary judgment. From our review of the record, it appears that the trial court's focus was on the alleged breach that was least in dispute, i.e., Dr. Vraney's action in withholding his hospital billings after May 16, 2007. However, we are of the opinion that there are several actions, on the part of both parties, which may have resulted in a breach of the contract well before Dr. Vraney withheld his accounts receivable. The trial court, however, failed to thoroughly consider the effect of these actions, and thus failed to answer the question of when the first breach occurred. Resolution of this issue is absolutely necessary to resolve the issues in this case. In addition, the trial court failed to consider the actions of the Clinic in possibly waiving any breach by Dr. Vraney, if he is found to have first breached the contract. Consequently, we turn to consider the actions of each party in turn. Based upon the foregoing authority, it is axiomatic that the parties' actions must be examined against the language they employed to express their intent. Thus, we begin with the plain language of the contract.

### 1. Initial Contract

The employment agreement provides, in relevant part:

> 1. **TERM** . . .
> Notwithstanding the twelve-month term described above, either you or we may terminate this employment agreement at any time within that period on sixty days' notice to the other.

-31-

Consequently, your employment is essentially "at will."  If we terminate your employment under this paragraph, your salary will continue as you work for those sixty days, or until you obtain other employment or otherwise commence practice, if that occurs sooner.

2.  **EXCLUSIVE EMPLOYMENT**– As an employee, you will be involved full-time in our practice of medicine, practicing the specialty of pulmonology and you will not take any outside employment during any term of this agreement without our written approval.

3.  **COMPENSATION**– Your salary during the twelve-month term of this contract will be $12,500 per month, which annualizes to $150,000 per annum.

In addition, we will pay you a bonus equal to 100% of the Profits, if any, generated by your Net Receipts during the twelve-month term of this contract.  "Net Receipts" are defined as gross receipts for patient services rendered by you less (a) refunds and (b) returned checks.  "Profits" means the profit determined by subtracting from your Net Receipts (i) your salary and benefits; and (ii) your share of direct and general overhead, and (iii) your practice revenue deficit. . . .

\*                                    \*                                    \*

6.  **VACATION LEAVE**– You will be entitled to three weeks of compensated leave.  In addition, you will be entitled to one week of paid professional/educational absence.

Arrangements for all such absences must, of course, be made in advance to ensure that our practice is properly covered.  Unused absences cannot be carried over to succeeding years, nor do we pay for time not taken.

\*                                    \*                                    \*

9.  **NO OWNERSHIP INTEREST**– During the term of this Agreement, you will not be required to contribute any personal

money toward the practice's equipment or operations but, likewise, your work will give you no financial interest in the accounts receivable, furniture, equipment, leasehold, patient charts and records, or the like.

10. **NON-SOLICITATION COVENANT**– You agree that during the term of this Agreement (including any extensions), and for a two year period after your employment under this Agreement terminates (regardless of the reason or whether you or we discontinue the relationship), you will not (i) solicit for treatment outside the Clinic any patient or member of any patient's household) of the practice; (ii) induce or attempt to influence any employee or patient of the Clinic to terminate his/her relationship with the practice; (iii) induce or attempt to influence any hospital or any other healthcare facility or any physician or any other professional with a referring relationship with the practice to terminate that relationship; or (iv) solicit any patient/service contractual arrangement of the Clinic.

## 2. Actions of the Parties prior to giving written "Notice" of termination of employment

### a. Outside Employment

The employment contract states that Dr. Vraney "will not take any outside employment during any term of this agreement without [the Clinic's] written approval." It is undisputed that Dr. Vraney incorporated a new practice on March 29, 2007, and began the process of establishing that practice as an entity with various insurance providers, informing them that the new practice would begin on May 17, 2007. Dr. Vraney asserts that his actions in doing so did not constitute "outside employment" in violation of the contract; rather, he contends that his actions constitute mere preparation for his new employment, which he would actually begin after he left the Clinic. The Clinic argues that by setting up his own corporation, Dr. Vraney had taken "outside employment" at least as of the date of incorporation, March 29, 2007. This disagreement as to the inference to be drawn from Dr. Vraney's actions creates a dispute of material fact that was not resolved by the trial court. If, as Dr. Vraney argues, his actions were merely preparation and did not go so far as to constitute "outside employment," then there was no breach of the plain language of the

contract.[2]  If, however, as the Clinic argues, Dr. Vraney's actions in incorporating his own practice constitute "outside employment," then (barring waiver or modification, *see* discussion *infra*), Dr. Vraney may have committed a material breach of the contract when he began the preparations for his new practice and, at least, by the time he incorporated the practice on March 29, 2007. We note that from our review of the evidence contained in the record, Dr. Vraney's actions appear to constitute only preparation for pursuing his own business as of the March 29, 2007 date. As previously stated, mere preparation for outside employment, is not sufficient to constitute a breach of contract. *See **Eaves v. Hillard Co., Inc.***, No. 88-37-II, 1988 WL 49959, at *3 (Tenn. Ct. App. 1988) (citing **United Board & Carton Corp. v. Britting**, 63 N.J. Super. 517, 164 A.2d 824 (N.J. Super. 1959) ("[A]n employee . . . may anticipate the future termination of his employment and, while still employed, make arrangements for some new employment by a competitor, or the establishment of his own business in competition with his employer.")). However, this issue was neither considered nor resolved by the trial court. As such, we decline to address it on appeal. *See **White v. Target Corp.***, No. W2010-02372-COA-R3-CV, 2012 WL 6599814l, at *8 (Tenn. Ct. App. Dec. 18, 2012) ("Because the trial court below apparently did not address these arguments . . . , we also decline to address them on appeal.").

### b.  Full Time Employment

In early March 2007, Dr. Vraney notified the office staff of his intent to limit his clinic hours significantly, beginning in May 2007.  The Clinic contends that, in doing so, Dr. Vraney breached the contract by failing to work a full-time schedule; the contract provides that Dr. Vraney "will be involved full-time in our practice of medicine." As discussed above, the Clinic opines that Dr. Vraney's request for a reduced office schedule resulted in Dr. Vraney's failure to work a full-time schedule, which was a breach of the contract.  In the first instance, there is no indication in the record that Dr. Vraney actually limited his office hours until the beginning of May 2007.  Although he notified the staff of his intent to reduce his office hours, the notice clearly indicates that it is Dr. Vraney's intent to begin the modified

---

[2] Our holding does not preclude the trial court from considering the doctrine of anticipatory breach. As discussed in Steven W. Feldman, 22 Tennessee Practice Contract Law & Practice § 11:16 (2006):

> A party having a present duty of performance may violate a contract under the doctrine of breach by anticipatory repudiation. With this doctrine, the party's words and actions amount to a total and unqualified inability or refusal to perform a contract before the designated date, which activity constitutes a refusal to perform it at any time.

*Id*. (footnote omitted).  There is some evidence in the record to suggest that the Clinic takes the position that, even if Dr. Vraney's actions in setting up his new practice did not rise to the level of absolute breach of the contract, the Clinic may have viewed these actions as proof of Dr. Vraney's intent to abandon the contract.

schedule no earlier than May 1, 2007.[3]

Notwithstanding the fact that Dr. Vraney did not, in fact, modify his schedule until May 1, 2007, a second question emerges due to the fact that the contract does not define what is meant by "full-time" employment. Dr. Teer stated his belief that, in order to maintain full-time employment, Dr. Vraney would have had to work the same schedule that he had worked during the majority of his four-year tenure. According to Dr. Vraney, this schedule was untenable and had resulted in his working eighty to ninety hours per week, seeing both office and hospital patients. Although he admits to a significant reduction of his office hours, Dr. Vraney contends that, even after he cut his office hours, he continued to work more than forty hours per week with hospital patients. As stated in his response to the Clinic's statement of undisputed material facts:

> ***Defendant's Statement 7.*** *Twenty-nine days prior to announcing his resignation, Plaintiff unilaterally began to reduce his schedule by limiting his new patient appointments by refusing new patients without physician to physician requests. While Plaintiff provided this memo to the clerical scheduling staff, he did not inform any of the physicians or management of the Clinic that he was reducing his in-office schedule.*
> **Plaintiff's Response 7.** This statement is disputed: Dr. Vraney did send a memo to the scheduling staff at Defendant Clinic on March 1, 2007, to limit his new patient appointments and require physician referrals. However, this did **not** mean that he was reducing his schedule; instead, Dr. Vraney thought it "would be inappropriate to accept responsibility for caring for a patient for which [he] would not be able to follow up." Dr. Vraney **continued to work full time** even with a reduced Clinic in-office schedule.

(Emphasis in original) (internal citations to record omitted).

When reviewing a grant of summary judgment, we are directed to:

> [M]ake a fresh determination that the requirements of [Rule] 56 [of the Tennessee Rules of Civil Procedure] have been satisfied. ***Hunter v. Brown***, 955 S.W.2d 49, 50–51 (Tenn. 1997); ***Mason***

---

[3] Again, there may be an anticipatory breach question. Our holding does not preclude the trial court from exploring that issue upon remand.

> *v. Seaton*, 942 S.W.2d 470, 472 (Tenn. 1997). We must consider the evidence in the light most favorable to the non-moving party, and we must resolve all inferences in the non-moving party's favor. *Doe v. HCA Health Servs., Inc*., 46 S.W.3d 191, 196 (Tenn. 2001); *Memphis Hous. Auth. v. Thompson*, 38 S.W.3d 504, 507 (Tenn. 2001). When reviewing the evidence, we must determine first whether factual disputes exist. If a factual dispute exists, we must then determine whether the fact is material to the claim or defense upon which the summary judgment is predicated and whether the disputed fact creates a genuine issue for trial. *Byrd v. Hall*, 847 S.W.2d at 214; *Rutherford v. Polar Tank Trailer, Inc*., 978 S.W.2d 102, 104 (Tenn. Ct. App. 1998).

*Jeffries v. Tennessee Dept. of Correction*, 108 S.W.3d 862, 869 (Tenn. Ct. App. 2002). We conclude that Dr. Vraney's assertion that he continued to work a full-time schedule even after he limited his office schedule creates a dispute of material fact. Taking as true Dr. Vraney's testimony that, prior to limiting his office hours, he worked over eighty hours most weeks, it is not unreasonable to infer that cutting those hours to just over forty hours per week could still be considered full-time employment. At any rate, this issue was not resolved by the trial court. Rather, it appears that the trial court gave the inference in favor of the Clinic in determining that Dr. Vraney failed to work full time once he limited his office hours. Any inference, however, should have been given in favor of Dr. Vraney at the summary judgment stage. Accordingly, the finding of any breach based upon failure to work a full-time schedule was improper in the absence of a resolution concerning what the parties meant by the term "full-time" as used in the contract.

### 3. Effect of Dr. Vraney's March 30, 2007 "Notice"

"The supreme court since *Little* [*v. Federal Container Corp.*, 452 S.W.2d 875 (Tenn. 1970)] has noted that 'a contract of employment for a definite term may not be terminated before the end of the term, except for good cause or by mutual agreement, unless the right to do so is reserved in the contract.'" *Petschonek v. Catholic Diocese of Memphis*, No. W2011-02216-COA-R9-C, 2012 WL 1868212 (Tenn. Ct. App., May 23, 2012) (citing *Bennett v. Steiner–Liff Iron and Metal Co.*, 826 S.W.2d 119, 121 (Tenn.1992) (citing *Nelson Trabue, Inc. v. Professional Management-Automotive, Inc.*, 589 S.W.2d 661 (Tenn. 1979)). As set out in full context above, the employment agreement requires sixty days notice of termination of employment by the terminating party. Here, it is undisputed that Dr, Vraney sent a letter, dated March 30, 2007, to the Clinic informing his colleagues that he would be leaving the practice effective June 30, 2007. Dr. Vraney, therefore, provided more

than sixty days notice to the Clinic and, accordingly, his letter (on its face) satisfies the notice requirement contained in the agreement.

Notwithstanding the fact that Dr. Vraney's foregoing actions, e.g., less than full time employment, may have resulted in breaches unknown to the Clinic at the time Dr. Vraney submitted his March 30, 2007 notice, we can say definitively that Dr. Vraney's March 30, 2007 letter was sufficient to provide adequate notice under the contract. From the record, it appears that the Clinic initially accepted Dr. Vraney's notice, and that it was amenable to the termination date of June, 2007. Other than setting the termination of employment date, Dr. Vraney's letter does not appear to modify any of the other terms of the original contract.

### 4. Actions of Parties after Dr. Vraney tendered his March 30, 2007 notice.

#### a. Constructive Termination of Dr. Vraney's Employment

Throughout these proceedings, Dr. Vraney has asserted that, when the Clinic fired Ms. Emison on May 7, 2007, it limited his ability to see office patients, which resulted in a constructive termination of his employment. From our review of the record, the trial court did not address this contention. Initially, we note that the issue of constructive termination in this case is distinguishable from cases where an at-will employee claims constructive discharge based upon a hostile work environment, discrimination, or some non-feasance on the part of the employer. *See Phillips v. Interstate Hotels Corp.*, 974 S.W.2d 680 (Tenn. 1998); *Campbell v. Florida Steel Corp.*, 919 S.W.2d 26 (Tenn. 1996). Here, Dr. Vraney contends that the Clinic's termination of Ms. Emison's employment severely limited his ability to do his job in the office, effectively terminating his employment, without officially or formally ending the employment agreement. We view this issue strictly as one of breach of contract and conclude that the evidence clearly establishes a dispute of material fact concerning not only the reason for the Clinic's firing Ms. Emison, but also the effect of that firing on Dr. Vraney's ability to service patients in-clinic. If, as Dr. Vraney asserts, the termination of Ms. Emison's employment resulted in a constructive termination of his employment, then it could be concluded that the Clinic breached the contract as of May 7, 2007 and that Dr. Vraney would not be bound by the employment agreement thereafter. At any rate, the fact that the issue of Ms. Emison's departure from the Clinic, and its effect (if any), has not been resolved creates a dispute of material fact concerning whether Dr. Vraney's employment was constructively terminated prior to any breach he may have committed. Without resolution of this issue, summary judgment was premature.

#### b. Clinic's notice to the Patients

On May 10, 2007, Dr. Hollis sent a letter to the Clinic's patients, stating, in pertinent

part that:

> Recently, Dr. Vraney informed us that he plans to leave our clinic on June 30, 2007. At this time, we do not know the location of his future practice. . . .

Throughout these proceedings, Dr. Vraney has maintained that, based upon his March 30, 2007 notice letter, wherein he stated that: "I will continue to work in the hospital as a Pulmonary/Critical Care consultant and look forward to continuing our professional relationship with those of you who will need consultation . . . ," the Clinic was on notice that Dr. Vraney's new practice would be based at the Jackson-Madison County General Hospital. Accordingly, Dr. Vraney contends that the Clinic had sufficient information to properly inform its patients that Dr. Vraney would be continuing his practice at the hospital. By stating, in its May 10, 2007 notice to the patients, that "we do not know the location of [Dr. Vraney's] future practice," Dr. Vraney argues that the Clinic breached its duty of good faith and fair dealing. Thus, he asserts that the Clinic's publication of information, which it knew to be false, to the patients was an attempt to keep those patients from seeking Dr. Vraney's care after he left the Clinic:

> ***Defendant's Statement 14**. In resigning, Plaintiff informed the physicians at the Clinic that his new practice structure was unknown and there were questions about how it would best work. At that time, Plaintiff had no physical office location picked out yet. Plaintiff did not advise his employer where his new practice would be located.*
> **Plaintiff's Response 14**. This statement is disputed: When he delivered his letter of resignation on March 30, 2007, to the physicians at Defendant Clinic, Dr. Vraney did inform the Clinic that his new practice **structure** was unknown and that he was unsure of exactly how it would work; his plans were tentative in nature, and Dr. Vraney did not want to expressly define his new practice to the Clinic until his plans were more concrete. Dr. Vraney had no physical **office** location established for his new practice when he was wrongfully terminated from Defendant Clinic on or about May 22, 2007. However, even though Dr. Vraney did not advise Defendant Clinic of the specific address of his new **office**, Defendant Clinic knew that Dr. Vraney's **practice** would continue at the same hospital.

(Emphasis in original) (internal citations to record omitted). Again, at the summary judgment

stage, we must give any reasonable inference in favor of Dr. Vraney. Accordingly, Dr. Vraney's contention that the Clinic intentionally mislead its patients concerning the fact that Dr. Vraney would continue to practice medicine in Jackson could be construed as a breach on the Clinic's part. This dispute was not resolved by the trial court prior to its grant of summary judgment.

### c. Effect of Dr. Vraney's retention of his hospital billings after May 17, 2007

It is undisputed that, beginning May 17, 2007, Dr. Vraney stopped submitting his hospital billings to the Clinic for collection. Rather, by this time, he had turned those billings over to Advanced Medical, with instruction to deposit the funds received for his credit, not the Clinic's. The trial court specifically found that Dr. Vraney's actions in keeping this portion of his accounts receivable resulted in a breach of contract on his part, and further resulted in a breach of his duty of loyalty, *see* discussion below. Consequently, Dr. Vraney's retention of his hospital billings after May 17, 2007 was the ground for the trial court's grant of summary judgment.

However, if, as Dr. Vraney asserts, either the fact that the Clinic terminated Ms. Emison's employment, and/or the fact that it disseminated erroneous information to Dr. Vraney's patients constitutes a breach on the part of the Clinic, then there is a viable argument that Dr. Vraney did not breach the contract by withholding his accounts receivable from the point of the Clinic's breach. The result is that the question of first breach must be resolved before the effect of the parties' subsequent actions can be determined.

It is well settled that the party that first materially breached a contract is "not entitled to damages stemming from the other party's later material breach of the same contract." *See United Brake Sys., Inc. v. American Envtl. Protection*, 963 S.W.2d 749, 756 (Tenn. Ct. App.1997) (quoting *McClain v. Kimbrough Const. Co., Inc.*, 806 S.W.2d 194, 199 (Tenn. Ct. App. 1990); *Santa Barbara Capital Corp. v. World Christian Radio Found. Inc.*, 491 S.W.2d 852, 857 (Tenn. Ct. App.1972)) (holding there can be no recovery for damages in a breach of contract action by the party who himself breached the contract). This begs the question of whether the alleged breaches, i.e., constructive termination and dissemination of incorrect information, were material. Only the Clinic's uncured material failure to perform its own contractual obligations would have excused Dr. Vraney from performing his remaining obligations, including tender of his accounts receivable. *See* Restatement (Second) of Contracts § 237 (1979) (noting that, with one exception not applicable to this case, "it is a condition of each party's remaining duties to render performances to be exchanged under an exchange of promises that there be no uncured material failure by the other party to render any such performance due at an earlier time."). The circumstances significant in determining whether a party's failure to perform is material include: (a) the extent to which the injured

party will be deprived of the benefit which he reasonably expected; (b) the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived; (c) the extent to which the party failing to perform or to offer to perform will suffer forfeiture; (d) the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances; (e) the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing. Restatement (Second) of Contracts § 241 (1979); *McClain v. Kimbrough Const. Co., Inc.*, 806 S.W.2d 199.

The trial court did not resolve the issues of whether the Clinic materially breached the contract by either terminating Ms. Emison's employment, or by sending an erroneous letter to the patients. Dr. Vraney repeatedly asserted in the trial court that he was "confused" as to when any breach occurred. For example:

> ***Defendant's Statement 16***. *Although throughout the course of his employment Plaintiff's custom was to turn in his hospital charges to the Clinic twice per week, beginning May 17, 2007, Plaintiff ceased turning in his hospital charges to his employer, thereby preventing the Clinic from billing for those services and collecting those amounts.*
>
> **Plaintiff's Response 16**. This statement is disputed: Throughout the employment relationship, Dr. Vraney would turn in his hospital charge sheets to members of the billing staff at the Clinic about twice per week so the Clinic could bill his patients. As of May 17, 2007, Dr. Vraney stopped turning in his hospital charges to the Clinic's billing staff, preventing the Clinic from billing and collecting for services Dr. Vraney performed from May 17 to May 30, 2007. The billing statements for this thirteen-day period in May went through Advanced Medical Billing, Dr. Vraney's billing service, some time in or around August 2007. Dr. Vraney did not remit the billing sheets to Defendant Clinic due to his honest confusion as to the status of his employment relationship for the time period between May 17 and May 30, 2007. Dr. Vraney knew that he needed to remit the billing sheets to the Clinic for a certain time period, but he neither knew the exact time period nor could he communicate with the Clinic, even after multiple attempts to make contact, to determine the proper remission of the billing sheets.

(Emphasis in original) (internal citations to record omitted). Given our discussion to this point, we are likewise unable to determine which party breached first, the effect of the first breaches, and the effect, if any, of subsequent promises and breaches, *see infra*. In the absence of these determinations, the question of whether Dr. Vraney's action in withholding his hospital billings after May 17, 2007 was excused remains unresolved. Accordingly, summary judgment was premature absent this analysis.

### d. Effect of Dr. Vraney's reduced schedule, beginning in May 2007

The fact that the Clinic may have breached the employment agreement on either May 7, 2007 (when it fired Ms. Emison), and/or on May 10, 2007 (when it sent the letter to its patients) is complicated further by the undisputed fact that, as of May 1, 2007, Dr. Vraney did limit his office schedule significantly. However, as discussed above, the question of whether the reduced schedule constitutes a material breach of the contract requires the trial court to first determine what the parties meant by "full time" as used in their contract. If the trial court determines that Dr. Vraney's limited office schedule resulted in his failure to work "full time," then he may have breached the contract as early as May 1, 2007, which is prior to the Clinic's termination of Ms. Emison's employment on May 7. Consequently, the question of first breach must be answered before the effect of the parties' subsequent actions can be determined and damages awarded.

### 5. Effect of the Clinic's May 22, 2007 "Notice" Letter

Based upon the foregoing discussion, factual disputes exist as to whether the contract may have been breached by both parties prior to written notice being given by either. However, based upon the parties' actions even after Dr. Vraney incorporated his new practice, and cut his May office hours, and even after Ms. Emison was fired, this Court questions the effect of the Clinic's May 22, 2007 "notice." It is undisputed that, despite the foregoing allegations of breach, i.e., outside employment, lack of "full time" employment, constructive termination of employment, and breach of duty of good faith and fair dealing, the parties continued to work together through the end of May. The parties' contract states that "your salary will continue as you work for those sixty days [however calculated], or until you obtain other employment or otherwise commence practice, if that occurs sooner." Despite the fact that the contract clearly states that the Clinic's obligation to pay Dr. Vraney would end when he had obtained other employment or otherwise commenced practice , by its letter of May 22, the Clinic states that it will pay Dr. Vraney his salary and bonuses: "You will be paid your salary through the end of May, and your quarterly bonus shortly after the end of the second quarter consistent with the payment of other bonuses." Although, and as discussed above, under the facts of this case, it might be possible to conclude that Dr. Vraney breached his employment contract prior to this letter, e.g., when he limited his hours at the

Clinic, the Clinic specifically agreed to pay him through the end of May. The question, then, is whether the Clinic's letter obligated them to pay a voidable debt.[4]

As stated in the Restatement (Second) of Contracts § 85 (1979):

> [A] promise to perform all or part of an antecedent contract of the promisor, previously voidable by him, but not avoided prior to the making of the promise, is binding.

The issue of the effect of the May 22, 2007 letter was not specifically resolved in the trial court. Under the plain language of the letter, however, the Clinic appears to make two promises. First, it promises to pay Dr. Vraney's base salary for the month of May 2007. Second, it promises to pay his bonus through the end of the second quarter of 2007, i.e., through June 30, 2007. If the May 22, 2007 letter is found to obligate the Clinic on these promises, the question arises whether Dr. Vraney's actions, subsequent to the March 22, 2007 letter, would discharge either, or both, of the Clinic's obligations under the letter.

### a. Dr. Vraney's letter to other medical providers

Near the end of May 2007, or as late as early June 2007, Dr. Vraney sent a letter to several medical providers in the West Tennessee area. The letter stated, in part, that:

> I wish that with this departure I might be able to recommend to you the individuals at Medical Specialty Clinic either as quality physicians or as decent human beings. Unfortunately, after

---

[4] There is some indication in the record that Dr. Vraney asserts an argument along the lines of waiver or estoppel. We note that waiver is defensive in nature, in that it is ordinarily raised as a defense to a claim based on breach of contract. "Waiver is not a cause of action because it cannot create liability in and of itself, and waiver cannot be asserted in a complaint as an offensive weapon." 28 Am. Jur.2d Estoppel & Waiver § 167 (2000); *see Madden Phillips Constr., Inc. V. GGAT Development Corp.*, 315 S.W.3d 800 (Tenn. Ct. App.2009) (recognizing that waiver is an affirmative defense under Tennessee Rule of Civil Procedure 8.03; discussing Tennessee cases on the point). Affirmative defenses not properly raised before the trial court generally do not merit consideration on appeal. *Harlan v. Hardaway*, 796 S.W.2d 953, 957 (Tenn. Ct. App.1990); *see also 94th Aero Squadron of Memphis, Inc. v. Memphis–Shelby County Airport*, 169 S.W.3d 627, 633 (Tenn. Ct. App. 2004) (citing *Simpson v. Frontier Cmty. Credit Union*, 810 S.W.2d 147, 153 (Tenn. 1991); *Fidelity–Phenix Fire Ins. Co. v. Jackson*, 181 S.W.2d 625, 629 (Tenn. 1944)). An exception lies for issues not raised in the pleadings, but tried by implied or express consent of the parties. Tenn. R. Civ. P. 15.02; *Zack Cheek Builders, Inc. v. McLeod*, 597 S.W.2d 888, 890 (Tenn.1980). Our conclusion, therefore, should not preclude the trial court from revisiting this issue upon remand if it deems it necessary.

witnessing the business practices of the organization I can only
say that they are not guided by anything resembling basic
Christian principles**.**

Throughout these proceedings, the Clinic has maintained that Dr. Vraney's letter violated the contract provision that Dr. Vraney not "induce or attempt to influence any hospital or any other healthcare facility or any physician or any other professional with a referring relationship with the practice to terminate that relationship**."** This question was not specifically resolved by the trial court.

If the Clinic's May 22, 2007 letter is found to obligate it to pay both Dr. Vraney's salary and his second quarter bonus, the question arises whether Dr. Vraney's letter directly breached the non-solicitation provision(s) of the contract. If so, the Clinic may be relieved from any obligation it undertook by its May 22, 2007 letter. This issue has not been resolved.

### b.  Withholding hospital billings after May 17, 2007

There is some dispute in the record as to when the Clinic discovered that Dr. Vraney had directed that his hospital billing be collected by Advanced Medical. Notwithstanding the unanswered question of whether his action in withholding these accounts receivable was excused by virtue of previous breaches on the part of the Clinic, if the Clinic undertook an enforceable promise to pay his second quarter bonus (per its May 22, 2007 letter), then the question arises whether Dr. Vraney's withholding his hospital billings would relieve the Clinic from its agreement to pay Dr. Vraney's second quarter bonus.

As discussed by this Court in *German v. Ford*, 300 S.W.3d 692 (Tenn. Ct. App. 2009):

> [E]very contract imposes on the parties a duty of good
> faith and fair dealing in its performance. Restatement (Second)
> of Contracts § 205 (1981). For example, every contract includes
> an implied condition that one party will not prevent performance
> by the other party. *See Moody Realty Co. v. Huestis*, 237
> S.W.3d 666, 678 (Tenn. Ct. App. 2007) (citation omitted). This
> is easily seen where the prevention of the other party's
> performance takes the form of active hindrance:
>
> > In any kind of contract, if the right of one party to
> > compensation is conditional upon the rendition of
> > some service or other performance by him . . . , it

-43-

is nearly always a breach of contract for the other party to act so as to prevent . . . the performance of the condition. It is a breach of duty, only because the court finds a promise by implication not to prevent or hinder.

6 Arthur Linton Corbin, Corbin on Contracts § 571 (Interim ed.). Where the plaintiff's performance has been wrongfully prevented or hindered by the conduct of the defendant, "[o]nly the law of the jungle would say that plaintiff's failure to perform should not be excused." Perillo, *supra*, § 11.28.

In some circumstances, the obligee may unjustly prevent the obligor's performance merely by inaction, that is, passive non-cooperation. *Id*. In such a case, the court may find an implied or constructive condition requiring the obligee to render active cooperation, so as not to prevent the performance of the obligor:

> If a contract is such that a certain performance by one party is necessary in order to earn the compensation that has been promised him, and that performance can not be rendered without the active co-Operation of the other party, a promise to render such co-Operation will usually be implied. If the performance promised by one party is such that it can not be performed until the promisee has first laid the foundation on which it is to be built or otherwise done, the laying of that foundation is a constructive condition of the duty of the promisor. . . . Co–Operation in good faith is impliedly promised by the one party and is also a constructive condition of the duty of the other party.

Corbin, *supra*, § 570. In some situations, such an implied or constructive condition may not be implied from the language of the contract. Rather, it is "imposed by law to do justice." Perillo, supra, § 11.8. The Restatement frames the issue in the context of the duty of good faith and fair dealing, noting: "[B]ad faith

-44-

may be overt or may consist of inaction, and fair dealing may require more than honesty," and bad faith can include "failure to cooperate in the other party's performance." Restatement (Second) of Contracts § 205 cmt. d (1981). The Restatement indicates that, in such circumstances, a contractual term requiring the act of cooperation may be supplied by the court:

> A . . . common example occurs where an obligor's duty cannot be performed without some act by the obligee, and the court supplies a term making that act a condition of the obligor's duty. In most such situations, the obligee's own obligation of good faith and fair dealing ... imposes on him a duty to do the act.

*Id*. § 226 cmt. c.

As with active prevention of another's performance, passive non-cooperation by one party may excuse performance by the other party:

> Where a duty of one party to a contract is subject to the occurrence of a condition, the additional duty of good faith and fair dealing imposed on him may require some cooperation on his part, either by refraining from conduct that will prevent or hinder the occurrence of that condition or by taking affirmative steps to cause its occurrence; non-performance of that duty when performance is due is a breach, and that has the further effect of excusing the non-occurrence of the condition itself, so that performance of the duty that was originally subject to its occurrence can become due in spite of its non-occurrence.

13 Richard A. Lord, Williston on Contracts § 38:11 (4th ed. Supp. 2008). Thus, if a party fails to cooperate in the occurrence of a condition for the purpose of avoiding performing the contract, the occurrence of the condition is excused. *See Kemmons Wilson, Inc. v. Allied Bank of Tex.*, 836 S.W.2d 104,

111–12 (Tenn. Ct. App.1992).

*German v. Ford*, 300 S.W.3d at 706–707. There is some question in the record as to whether Dr. Vraney's failure to proffer his hospital billings after May 17, 2007 hindered the Clinic's ability to calculate and pay the second quarter bonus. As noted by Dr. Vraney's attorney at the hearing on the motions for summary judgment: "The bonus is calculated upon receipts, not bills . . . [the Clinic] knew exactly what had been received as a result of Dr. Vraney's medical services." The question of whether it was necessary for the Clinic to have Dr. Vraney's hospital billing statements in order to calculate his second quarter bonus, and the question of whether his lack of cooperation in tendering these billings resulted in a frustration of the Clinic's promise to pay the second quarter bonus (if such promise is found) have not been resolved.

### 6. Severability

In resolving the substantive issues upon remand, the court should not lose sight of the fact that the contract contains the following provision:

> 12. **SEPARABILITY OF PROVISION**—If any part of this agreement is found to be invalid, illegal, or unenforceable in any respect, the remainder of its terms shall not be affected or impaired.

As discussed by our Supreme Court in *Baugh v. Novak*, 340 S.W.3d 372 (Tenn. 2011):

> [W]hen the provisions of a contract are legally severable, we must give effect to portions of the contract that may be enforced and invalidate only those portions of the contract that are unenforceable. *Biggs v. Reliance Life Ins. Co.*, 137 Tenn. 598, 607, 195 S.W. 174, 176–77 (1917); *see also* 21 Feldman § 7:6, at 737–38; 5 Williston § 12:3, at 885–86, 888, 892.

*Baugh*, 340 S.W.3d at 384. Accordingly, should the trial court determine that certain provisions of the contract are not enforceable, it should nonetheless consider whether the contract is severable such that the other provisions may still be enforced.

### C. Breach of Duty of Loyalty

In *Efird v. Clinic of Plastic and Reconstructive Surgery, P.A.*, 147 S.W.3d 208

(Tenn. Ct. App. 2003), this Court discussed the breach of duty of loyalty cause of action:

> An employee who breaches the fiduciary duty of loyalty may be required to disgorge any profit or benefit he received as a result of his disloyal activities. *See ITT Cmty. Dev. Corp. v. Barton*, 457 F.Supp. 224, 230 (M.D. Fla. 1978); *Clyde Rudd & Assocs., Inc. v. Taylor*, 29 N.C.App. 679, 225 S.E.2d 602, 604 (1976); Restatement (Second) of Agency § 469. In addition, an employee who breaches the duty of loyalty may be required to surrender any compensation paid by the employer during the period of breach. *Baker v. Battershell*, 1986 WL 7602, at *6 (Tenn. Ct. App. July 9, 1986) (citing *Red Boiling Water Co. v. McEwen*, 3 Tenn. C.C.A. (Higgins) 687 (Tenn. Ct. App. 1913)). It is not necessary that the employer suffer a loss in order to recoup such illicit profits or compensation from the employee. *Phansalkar v. Anderson Weinroth & Co.*, 344 F.3d 184, 200 (2d. Cir.2003); *Ross v. Calamia*, 153 Fla. 151, 13 So.2d 916, 917 (1943); *Faultersack v. Clintonville Sales Corp.*, 253 Wis. 432, 34 N.W.2d 682, 684 (1948); Restatement (Second) of Agency § 469.

*Id*. at 220.  Concerning what actions may rise to the level of a breach of the duty of loyalty, in *Booth v. Fred's, Inc.*, No. W2002-01414-COA-R3-CV, 2003 WL 21998410 (Tenn. Ct. App., Aug. 19, 2003), this Court explained:

> We equate breaches of [the] duty of loyalty with the acts of a traitor. Traditional examples of breaches of loyalty duties in the employment context include acts of an employee in direct competition with the financial, proprietary, or business interests of an employer, thereby placing the personal interests of the employee before those of the employer, the sale or distribution of employer's protected trade secrets, and a myriad of other destructive acts amounting to more than mere mistaken judgment or negligence. Breaches of loyalty are most often intentional, destructive acts completed explicitly for the employee's own self-interests, in direct violation or competition with the interests of an employer.

*Id*. at *13.  Because the question of breach of the duty of loyalty is necessarily tied to an interpretation or analysis of the termination provisions and definitions contained within the

employment agreement, and in light of the many questions that remain unanswered in this case, we cannot determine at this point whether there was a breach of this duty on the part of either party. Once the trial court has resolved the contract issues upon remand, it may then reevaluate the question of whether Dr. Vraney's actions constitute a breach of the duty of loyalty. The trial court may also need to evaluate the Clinic's actions to determine whether it breached any inferred contractual duties, such as the duty of good faith and fair dealing.

We have discussed only a sampling of the myriad questions left unresolved in this case. Any one of these disputed issues is sufficient to preclude the grant of summary judgment. It is clear that there is a need for evidence and full adjudication of the breach of contract claims on the merits. We remand for that purpose. Although we have specifically discussed some of the questions that may need to be answered, our objective is not to litigate the case for the parties, to limit the trial court's course of action upon remand, nor to limit the court's review to only those issues raised herein. Our holdings do not limit the evidence that may be proffered at the hearing, nor do we mandate that the trial court adjudicate every question we have raised herein. We merely endeavor to thoroughly support our conclusion that summary judgment was premature, and to give some guidance upon remand as to the types of questions that must be answered in resolving contractual disputes such as this.

## VII.  DAMAGES AND SPECIAL MASTERS' REPORTS

Tennessee Rule of Civil Procedure 53.01 allows trial courts to refer matters to special masters. *See* Tenn. R. Civ. P. 53.01 ("The court in which any action is pending may appoint a special master therein."). In ***Archer v. Archer***, 907 S.W.2d 412 (Tenn. Ct. App.1995), we explained that our standard of review is affected by a trial court's referral of issues to a special master:

> The court's order referencing certain matters to the Special Master, the Special Master's report, and the trial court's order affect our standard of review on appeal. A concurrent finding of a master and a trial court is conclusive on appeal, except where it is upon an issue not proper to be referred, where it is based on an error of law or a mixed question of fact and law, or where it is not supported by any material evidence. ***Coates v. Thompson***, 713 S.W.2d 83, 84 (Tenn.Ct.App.1986). This standard of review is similar to our standard when reviewing a jury verdict; we must affirm if there is any material evidence to support the trial court's concurrence. *See **Id**.*; T.R.A.P. 13(d) . . . .

***Archer***, 907 S.W.2d at 415.

The trial court, however, may not refer all matters to the special master. It is well-settled in Tennessee that:

> The main issues of a controversy and the principles on which these issues are to be adjudicated must be determined by the trial court. *State v. Bolt*, 130 Tenn. 212, 169 S.W. 761, 762 ( [Tenn.] 1914); *Ingram v. Stein*, 23 Tenn. App. 105, 126 S.W.2d 891, 892 ( [Tenn.] 1938). Collateral, subordinate, and incidental issues and the ascertainment of ancillary facts are matters properly referred to a special master. *Ingram*, 126 S.W.2d at 892.

*Archer*, 907 S.W.2d at 415–16.

Here, the trial court referred only the issue of damages (or the calculation of damages) to the Special Masters. The practice of referring damages issues to a special master is common in Tennessee. *See Clear Channel Outdoor, Inc. v. A Quality, Inc.*, No. W2007-00213-COA-R3-CV, 2008 WL 2901345, at *7 (Tenn. Ct. App. July 29, 2008) (citing a number of cases where damages issues were referred to a special master). Additionally, issues of accounting are properly referred to a special master. *See Hopkins v. First Tennessee Nat. Bank*, 560 S.W.2d 916, 917 (Tenn.1977).

The decision to a refer a matter to a special master is reviewed under an abuse of discretion standard. *Owens v. Owens*, 241 S.W.3d 478, 790 (Tenn. Ct. App. 2007). A trial court abuses its discretion when it has applied an incorrect legal standard or has reached a decision which is against logic or reasoning that caused an injustice to the party complaining. *Eldridge v. Eldridge*, 42 S.W.3d 82, 85 (Tenn. 2001). Under the abuse of discretion standard, the trial court's decision "will be upheld so long as reasonable minds can disagree as to the propriety of the decision made." *Id.* at 85. In other words, the abuse of discretion standard involves "a less rigorous review of the lower court's decision and a decreased likelihood that the decision will be reversed on appeal." *Lee Medical, Inc. v. Beecher*, 312 S.W.3d 515, 524 (Tenn. 2010) (citing *Beard v. Bd. of Prof'l Responsibility*, 288 S.W.3d 838, 860 (Tenn. 2009)). The standard "reflects an awareness that the decision being reviewed involved a choice among several acceptable alternatives." *Lee Medical, Inc.*, 312 S.W.3d at 524 (citing *Overstreet v. Shoney's, Inc.*, 4 S.W.3d 694, 708 (Tenn. Ct. App. 1999)). Accordingly, appellate courts are not permitted to "second guess" the trial court's determinations or to substitute their judgment for that of the trial court. *Lee Medical, Inc.*, 312 S.W.3d at 524 (citing *White v. Vanderbilt Univ*., 21 S.W.3d 215, 223 (Tenn. Ct. App. 1999)). "The abuse of discretion standard of review does not, however, immunize a lower court's decision from any meaningful appellate scrutiny." *Lee Medical, Inc.*, 312 S.W.3d at 524 (citing *Boyd v.*

***Comdata Network, Inc.***, 88 S.W.3d 203, 211 (Tenn. Ct. App. 2002)). Specifically in the case of a referral to a special master, the trial court's discretion must be exercised with the following considerations in mind:

> [T]he interests of justice will warrant a bifurcation of the issues in only the most exceptional cases and upon a strong showing of necessity. In making its decision the trial court should consider the possibility of juror confusion, the risk of prejudice to either party, and the needs of judicial efficiency. Above all, the issues at trial must not be bifurcated unless the issue to be tried is so distinct and separable from the others that a trial of it alone may be had without injustice.

***Ennix v. Clay***, 703 S.W.2d 137, 139 (Tenn. 1986) (citing ***Gasoline Prods. Co., Inc. v. Champlin Ref. Co.***, 283 U.S. 494, 500, 51 S.Ct. 513, 75 L.Ed. 1188 (1931)). Because contract damages are collateral to the determination of which party breached the contract, this issue is the type that is properly referred to the special master. *See* ***Clear Channel Outdoor, Inc. v. A Quality, Inc***.,2008 WL 2901345, at *7; ***Hopkins***, 560 S.W.2d at 917.

We have reviewed the Special Masters' reports and conclude that the trial court properly remanded the damages issue to the Special Masters for consideration. The trial court did not place any substantive legal issues in the Special Masters' purview. As noted by the Special Masters in their second report:

> Our conclusions are based on documents provided and do not include any legal analysis or legal opinion. The above information is only to assist the Court in . . . determining amounts due the parties. It was not in our charge to legally interpret the employment agreement . . . .

Rather, the Special Masters dealt only with the issue of damages, which was a proper subject, especially in light of the complex financial issues present in this case. Furthermore, after reviewing the evidence upon which the Special Masters based their calculations, we are of the opinion that their findings are well supported, and are not otherwise erroneous. Accordingly, upon remand, the trial court may rely upon the existing Special Masters' reports (if it chooses) to determine damages following adjudication of the substantive issues.

## VIII. CONCLUSION

For the foregoing reasons, we reverse the trial court's grant of summary judgment in

favor of the Clinic. We affirm the trial court's determination that Dr. Vraney is not entitled to payment of $25,000.00 for unused vacation time. We also affirm the trial court's use of the Special Masters' reports in this case. The case is remanded for such further proceedings as may be necessary and are consistent with this Opinion. Costs of the appeal are assessed one-half to the Appellant, Dr. George R. Vraney and his surety, and one-half to Appellee, Medical Specialty Clinic, for which execution may issue if necessary.

_____
J. STEVEN STAFFORD, JUDGE